THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WESTERN DIVISION                    CIVIL ACTION NO. 3:05-CV-30109-MAP

| | |
|---|---|
| JOANN PELLETIER | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| SANDRA T. TALBOT, CHITRA | ) |
| PUBLICATIONS, CHARIOT PUBLISHING, INC. | ) |
| As General Partner of Chitra Publications, | ) |
| CHRISTIANE MEUNIER, As Officer of Chariot | ) |
| Publishing, Inc., CHRISTIANE MEUNIER, As | ) |
| Owner of Chitra Publications, and CHRISTIANE | ) |
| MEUNIER d/b/a MOON OVER MOUNTAIN, | ) |
| Defendants. | ) |

## DEFENDANT, SANDRA TALBOT'S, OPPOSITION TO PLAINTIFF'S MOTION TO ATTACH REAL ESTATE

Now comes the defendant, Sandra Talbot ("Talbot"), and hereby respectfully opposes the plaintiff, JoAnn Pelletier's ("Pelletier's") Motion to Attach Talbot's Real Estate ("Attachment Motion"). Ms. Talbot requests that said Motion be denied for the following reasons.

### I.    Introduction

This is a dispute about an allegedly copyrighted quilt. As a result of this dispute, Pelletier seeks a *$250,000.00* attachment against the residential home of Sandra Talbot and her husband, Kent, where they have lived for 30 years. The Talbots raised their children in the house at issue, and have no present intention of moving. *See* Declaration of Sandra Talbot in Support of Opposition to Plaintiff's Motion to Attach Real Estate ("Talbot Decl."), ¶ 3.

Pelletier contends that she possess copyright protection in an original quilt design and the instructions for making that quilt.[1] She contends that Talbot, who also made a quilt, copied and infringed her design. Talbot denies that she copied Pelletier's quilt, denies that Pelletier's quilt constitutes an original work of authorship, and denies that the two quilts are sufficiently similar in relevant respects that Talbot's would constitute an infringement under any circumstances.

For the following reasons, an attachment of the Talbot's real estate is inappropriate.

**II.    Argument**

    **A.    The Court Has Already Found That Pelletier Has Not Demonstrated A Likelihood Of Success On The Merits**

Pelletier previously sought a preliminary injunction. The Court denied that motion. *See* Memorandum and Order Regarding Plaintiff's Motion for Preliminary Injunction, attached to the Declaration of Steven M. Coyle in Support of Opposition to Plaintiff's Motion for Real Estate Attachment ("Coyle Decl.") as Exhibit A.[2] After acknowledging the parties' competing and heavily fact-driven claims and defenses, and though noting that the issue may be close, the Court found that it "cannot say with assurance that there is a <u>likelihood</u> that Plaintiff will succeed on her claim of original design." *See id.* at p. 2 (emphasis in original).

As Pelletier acknowledges, to obtain an attachment the Court must find a "reasonable *likelihood*" that she will recover a judgment equal to or greater than the amount of the attachment sought. *See* Pelletier's Attachment Motion, p. 2, citing Mass. R. Civ. Pro. 4.1(c) (emphasis added). Pelletier has not demonstrated this. She failed to do so as part of her injunction motion,

---

[1] In quilting terms, the instructions are referred to as the "pattern."

[2] Hereafter, references to "Exhibit __" or Exh. __" will be to those attached to the Coyle Declaration.

2

and nothing has changed since then. Nothing learned in discovery has changed the principle

basis for finding a lack of proof of likelihood of success – that is, whether the quilt design in

question and/or any similarity between it and Talbot's quilt was actually the result of a "common

ancestor" quilt design by Janet Kime. *See* Exh. A, p. 2.

      Thus, Ms. Pelletier's Attachment Motion must be denied.

      B.    <u>Talbot Is Likely To Successful Defend Against Pelletier's Claims</u>

      The information learned through discovery has only further deepened the factual issues

and, if anything, point to the strong likelihood of <u>Talbot's</u> successful defense of the matter.[3] For

example, it is undisputed that Ms. Talbot first made her quilt in 1995-1996, while Pelletier never

actually made her allegedly copyrighted quilt until January of 1998. *See* Talbot Depo, attached

as Exh B, pp. 137; Pelletier Depo, attached as Exhibit C, pp. 134. Thus, Ms. Talbot made the

quilt first. Furthermore, Ms. Talbot testified that she never saw Pelletier's quilt before making

her own and that, quite possibly, Pelletier copied the quilt from Ms. Talbot after she showed her

quilt in Pelletier's quilting. See Talbot Depo, Exh. B, pp. 108-109. Ms. Pelletier also

acknowledged at her deposition the substantial identicality of elements from her quilt to that

disclosed earlier by the Janet Kime book. *See* Pelletier Depo, attached as Exhibit C, pp. 234-

245. These are only some of the examples of facts that support Talbot's likely success in her

---

[3] The discovery deadline, for both fact and expert discovery, has expired. Ms. Pelletier's brief suggests that some additional discovery may be sought. *See* Attachment Motion, pp. 4-5. Ms. Talbot, however (and presumably the Chitra defendants), maintain that no further discovery should be permitted. The deadlines were already extended once, and there is simply no ground for permitting continued, expensive discovery in this case.

defense of Pelletier's claims.[4]  Under the circumstances, an attachment of Talbot's real estate would be entirely inappropriate.

> **B.**    There Is No Basis For Concluding That Pelletier Will Recover Any Damages From Talbot

There is simply no reason to find that Pelletier will recover *any* amount from Talbot (or any other defendants), let alone an amount "equal to or greater than" $250,000.  *See* Mass. R. Civ. P. 4.1(c).

There are three types of damages recoverable in a copyright action under 17 U.S.C. § 504(b) and (c).  They are: (1) the defendant's profits; (2) actual damages; and (3) statutory damages.  Pelletier has not demonstrated a "likelihood" of recovery under any of these theories.

First, the evidence is undisputed that Ms. Talbot received no compensation from Chitra or anyone else for making the accused quilt.  Chitra did not pay her for the quilt, nor did Ms. Talbot receive any proceeds from the sales of any magazines or other publications including images of her quilt.  *See* Talbot Decl., ¶ 4.  Ms. Talbot never sold her quilt or commercialized it in any way and, therefore, made no profits.  *See* Talbot Decl., ¶ 4.  Furthermore, there is no

---

[4] In support of her contention that Ms. Talbot copied her quilt, Ms. Pelletier relies upon a Declaration from an alleged third-party witness, Connie Roy. Ms. Roy's Declaration lacks credibility, and is likely inadmissible. First, it is inherently ambiguous. Ms. Roy's Declaration testifies to having been shown Ms. Pelletier's "Sew Many Spools" quilt at some undated time in the 1990's. *See* Roy Declaration, attached to Pelletier's Attachment Motion, ¶¶ 4-5. However, it is undisputed that Ms. Pelletier did not finish her quilt until July 27, 1998 and did not begin to call the design "Sew Many Spools" until she sent her copyright application to Washington D.C. in September, 2004. *See* Pelletier depo, pp 52, 93 and 134-136; see also, Talbot Depo, Exh. B, pp. 130-133. This Declaration was first produced during the deposition of Ms. Talbot on July 20, 2006. When counsel for Ms. Pelletier was questioned by opposing counsel about this ambiguity she responded, quite correctly, "I cannot speak to Ms. Roy relative to her testimony." See Talbot Depo, Exh. B, pp. 132-133. Unfortunately, at the time this Declaration was produced Ms. Roy was battling cancer and has since passed away. There is no longer an ability to ascertain what she meant when she said that Ms. Pelletier showed the class the "Sew Many Spools" design, or when whatever design Ms. Roy was referring to was actually shown.

evidence that Chitra or the other defendants obtained any profits from their publication of images of Talbot's quilt. *See* Christiane Meunier Declaration, ¶ 3. Thus, there are no defendant profits available for Ms. Pelletier to recover as an element of damages in this case.

Ms. Pelletier cannot recover actual damages because there are none. She has never sold or otherwise attempted to commercialize the quilt design at issue. *See* Pelletier depo, pp. 206-208. She has not suffered any economic injury as a result of the defendants' allegedly wrongful conduct.

Finally, Pelletier will be legally precluded from obtaining statutory damages. "No award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for…(2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." 17 U.S.C. § 412. *See also Mason v. Montgomery Data, Inc.,* 967 F.2d 135 (5th Cir. 1992); *Qualey v. Caring Center of Slidell,* 942 F. Supp. 1074 (E.D. La. 1996) (explaining *Mason*); *Venegas-Herandez v. Sonolux Records*, 370 F.3d 183 (1st Cir. 2004) (concurring with the 5th Circuit's interpretation Section 504(c) in *Mason* regarding "awards" of statutory damages).

It is undisputed that the effective date of registration is September 17, 2004. *See* Exhibit J of Pelletier's Attachment Motion. Ms. Pelletier's Certificate of Registration identifies the first publication of her work as January 21, 1993. *Id.* Thus, the first publication clearly occurred well before registration.[5]

---

[5] Note that this is true even if Pelletier's first publication was in January of 1998, when she actually made her quilt.

It is also indisputable that any act of infringement allegedly committed by Ms. Talbot occurred prior to Ms. Pelletier's copyright registration. She made her quilt in 1995 or 1996, and Pelletier was aware of this at least as of sometime in 2000.[6] *See* Pelletier Depo, attached as Exh. C, pp. 171-175; Pelletier's Answers to Interrogatories, attached as Exh. E, Answer no. 3. This is the only quilt or work of Ms. Talbot accused by Ms. Pelletier of infringement. *See* Pelletier Depo, attached as Exhibit C, pp. 405-406. Ms. Talbot authorized Chitra to publish photographs of her quilt on or about September 18, 2002. *See* Exh. 11 of Talbot's Depo, attached as Exh. D. This is the universe of conduct that even arguably comprises Talbot's infringement. Accordingly, 17 U.S.C. § 412(2) precludes any recovery of statutory damages or attorney's fees since the accused infringement occurred after Ms. Pelletier's first date of publication, and before the effective date of registrations.

Pelletier contends that Talbot may be jointly or severally liable to the extent that the Chitra defendants bear liability. Again, though, Ms. Pelletier cannot demonstrate a reasonable likelihood of recovering anything, let alone $250,000, from the Chitra defendants. As noted, they made no profits, and Ms. Pelletier suffered no actual damages, leaving only statutory damages as a possible recovery means. However, Ms. Pelletier is barred from recovery of statutory damages against Chitra under 17 U.S.C. §412(2) just as with Ms. Talbot. Any act of

---

[6] At some point in early 2000, Ms. Talbot consulted Ms. Pelletier about the quilt at issue as she was preparing to hang it at a local quilt show. *See* Pelletier's Answers to Interrogatories, attached as Exhibit E, Answer no. 3.

6

infringement allegedly committed by Chitra occurred prior to September 17, 2004, the date of Ms. Pelletier's registration.[7][8] Thus, not statutory damages are available to Ms. Pelletier.

Finally, even if statutory damages were theoretically available to Ms. Pelletier (which, respectfully, they are not), there is absolutely no basis for Ms. Pelletier's contention that the Court is reasonably likely to award an amount "equal to or greater than" $250,000.00. *See* Mass. R. Civ. P. 4.1(c). Therefore, granting Ms. Pelletier's motion would be inappropriate.

### III. Conclusion

For all of the above reasons, Ms. Pelletier's Attachment Motion must be denied.

**Oral Argument Requested**

---

[7] For example, Chitra' two publications containing images of Ms. Talbot's quilt were published in October/November 2003 and August/September 2004. *See* Pelletier's Answers to Interrogatories, attached as Exh. E, Answer no. 8.

[8] Chitra's continuing publication of these periodicals or advertising of them on its websites after September 17, 2004 does not save Ms. Pelletier's claim for statutory damages. *See e.g., Qualey v. The Caring Center of Slidell,* 942 F.Supp. 1074, 1076-77 (E.D. La 1996), citing *Mason v. Montgomery Data, Inc.,* 967 F.2d 135, 143 (5th Cir. 1992) (noting "Congress' intent that statutory damages be denied [under § 412] not only for a particular infringement that a defendant commenced before registration, but for all of that defendant's infringements of a work if one of those infringements commenced prior to registration" and, further, "that statutory damages are to be calculated according to the number of works infringed, not the number of infringements…regardless of whether the acts [of infringement] were separate, isolated, or occurred in a related series."); *see also Great Southern Homes, inc. v. Johnson & Thompson Realtors,* 797 F.Supp. 609 (M.D. TN 1992) (no statutory damages available to holder of copyrighted home plans, where plans were not registered until after defendant copied plans and used them to construct a dwelling; construction of additional homes was not distinct act of infringement, but merely served to multiply any damages attributable to original infringing act of copying home plans); *Singh v. Famous Overseas, Inc.,* 680 F.Supp. 533 (E.D. N.Y. 1988) (holding that under § 412 "infringement" can mean either a single act or several or repeated acts of infringement, and has this latter meaning for infringement of copyright in unpublished work commenced before the effective date of registration).

By _____

Steven M. Coyle, B.B.O. #564189
CANTOR COLBURN LLP
55 Griffin Road South
Bloomfield, CT 06002
(860) 286-2929

I hereby certify that a true copy of the
above document was served upon the
attorney of record for each party
through the ECF system on the  20th
day of November 2006.

_____

Steven M. Coyle, Esq.

THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WESTERN DIVISION                      CIVIL ACTION NO. 3:05-CV-30109-MAP

JOANN PELLETIER                          )
                                         )
                    Plaintiff,           )
                                         )
v.                                       )
                                         )
SANDRA T. TALBOT, CHITRA                 )
PUBLICATIONS, CHARIOT PUBLISHING, INC. )
As General Partner of Chitra Publications, )
CHRISTIANE MEUNIER, As Officer of Chariot )
Publishing, Inc., CHRISTIANE MEUNIER, As )
Owner of Chitra Publications, and CHRISTIANE )
MEUNIER d/b/a MOON OVER MOUNTAIN,        )
                    Defendants.          )

## DECLARATION OF STEVEN M. COYLE IN SUPPORT OF OPPOSITION TO PLAINTIFF'S MOTION FOR REAL ESTATE ATTACHMENT

I, Steven M. Coyle, do hereby swear and state as follows:

1.      I am lead counsel for the Plaintiff, Faro Technologies, Inc., in the above referenced matter.

2.      Attached hereto as Exhibit A is a true and accurate copy of the Memorandum and Order Regarding Plaintiff's Motion for Preliminary Injunction.

3.      Attached hereto as Exhibit B is a true and accurate copy of pages from Sandra T. Talbot's deposition taken on July 20, 2006.

4.      Attached hereto as Exhibit C is a true and accurate copy of pages from Jo Ann Pelletier's deposition taken on June 21, 2006.

5.      Attached hereto as Exhibit D is a true and accurate copy of Exhibit 11 of Sandra T. Talbot's deposition taken on July 20, 2006.

6.    Attached hereto as Exhibit E is a true and accurate copy of Plaintiff Pelletier's Answers to First Set of Interrogatories of Defendant, Sandra T. Talbot.

Signed and sworn to under the pains and penalties of perjury this 20th day of November 2006.

Date:  November 20, 2006

Steven M. Coyle, Esq.

Respectfully Submitted,

Sandra T. Talbot
Defendant

By _____
Steven M. Coyle, B.B.O. #564189
CANTOR COLBURN LLP
55 Griffin Road South
Bloomfield, CT 06002
(860) 286-2929

I hereby certify that a true copy of the above document was served upon the attorney of record for each party through the ECF system on the 20th day of November 2006.

Steven M. Coyle, Esq.

# Exhibit A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JOANN PELLETIER,                    )
            Plaintiff              )
                                    )
        v.                          ) CIV. ACTION NO. 05-30109-MAP
                                    )
SANDRA T. TALBOT, ET AL.,           )
            Defendants             )

## MEMORANDUM AND ORDER REGARDING
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION
(Dkt. No. 19)

May 22, 2006

PONSOR, D.J.

Plaintiff JoAnn Pelletier has filed this suit, alleging copyright infringement by Defendants Sandra T. Talbot, Chitra Publications, Chariot Publishing, Inc., and Christiane Meunier.

Plaintiff charges that Defendants copied her quilt pattern and design, "Sew Many Spools," in their pattern "Just Spooling Around."

The Motion for Preliminary Relief seeks an order enjoining Defendants from reproducing, advertising for sale, or distributing quilts, pictures of quilts, or instructions for quilts that use Plaintiff's pattern or design.[1] Plaintiff also seeks an order requiring Defendants to produce certain information that would permit Plaintiff to calculate her damages.

---

[1] Defendant Talbot has already stipulated to entry of preliminary injunction (Dkt. No. 22). This order therefore concerns only the remaining Defendants.

The parties' submissions and oral argument presented a very close question on the issue of likelihood of success on the merits. Significant evidence suggests that the "Sew Many Spools" design and pattern was independently created by Plaintiff and that it possesses "at least some minimal degree of creativity." <u>Feist Publ'ns Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 345 (1991). In addition, the record is undisputed that Defendant Talbot took classes from Plaintiff at which quilting with the use of the traditional courthouse steps log cabin pattern was discussed.

On the other hand, certain evidence suggests that any similarity between "Sew Many Spools" and "Just Spooling Around" results from the existence of a common ancestor, namely certain quilts presented in a book by Janet Kime, <u>Log Cabins: New Techniques for Traditional Quilts</u> (1992). Thus the balance remains in equipoise, and Plaintiff is not entitled to preliminary relief. Although she will certainly have a strong case, the court cannot say with assurance that there is a <u>likelihood</u> that Plaintiff will succeed on her claim of original design. For this reason, the Motion for Preliminary Injunction is hereby DENIED.

In recognition of Plaintiff's near success in obtaining preliminary relief, the court will move this case quickly to trial. Along these lines, the court has ordered that all discovery in this case be completed by July 7, 2006, and that counsel appear before this court for a final pretrial

-2-

conference on July 20, 2006, at 3:00 p.m.  At least five (5)

days prior to the conference, counsel will file final

pretrial memoranda in accordance with the attached order.

Please note: failure to file a final pretrial memorandum as

ordered may result in default or dismissal.

It is So Ordered.

/s/ Michael A. Ponsor
MICHAEL A. PONSOR
U. S. District Judge

# Exhibit B

Page 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

WESTERN DIVISION            No. 3:05-CV-30109-MAP

```
* * * * * * * * * * * * * * * * *
JOANN PELLETIER,                  *
                Plaintiff         *
                                  *
vs.                               *
                                  *
SANDRA T. TALBOT, CHITRA          *
PUBLICATIONS, CHARIOT PUBLISHING, *
INC., As General Partner of Chitra*
Publications, CHRISTIANE MEUNIER, *
As Officer of Chariot             *
Publishing, Inc., CHRISTIANE      *
MEUNIER, As Owner of Chitra       *
Publications, and CHRISTIANE      *
MEUNIER d/b/a MOON OVER MOUNTAIN, *
                Defendants        *
* * * * * * * * * * * * * * * * *
```

DEPOSITION OF:  SANDRA T. TALBOT

DOHERTY, WALLACE, PILLSBURY and MURPHY, P.C.

1414 Main Street  19th Floor

Springfield, Massachusetts

July 20, 2006

(9:20 a.m. to 4:00 p.m.)

Tacy A. Malandrinos

Court Reporter

**SANDRA T. TALBOT**

**July 20, 2006**

---

Page 106

```
 1       Q.   So what you are trying to tell us
 2  is that and I don't know if --
 3       MR. BUCKLEY:  The last time I was
 4  here someone borrowed my book and made it
 5  an exhibit.  Now I'm less one book.
 6       MS. THOMPSON:  No.  I won't make
 7  it an exhibit.
 8       MR. COYLE:  You can.
 9       MR. BUCKLEY:  I only have one copy
10  of that book.  If you want to get one go
11  on line to quilters resources dot com and
12  you can buy one.
13       MS. THOMPSON:  I'm just going to
14  hold it up for a minute.
15       First of all, the name of this book
16  is Log Cabin New Techniques for
17  Traditional Quilts by Janet Kime.
18  Copyright 1992.
19       Q.   (By Ms. Thompson)  Is that the
20  book you are saying that you purchased?
21       A.   Yes, Ma'am.
22       Q.   And when did you purchase this?
23       A.   Probably right after it came out.
24       Q.   You don't know whether it was 1992,
```

---

Page 107

```
 1  1993, 1994?
 2       A.   Well, it had to be 1992 or early
 3  somewhere around there.  Probably 1992.
 4       Q.   Let's look at this.  This is the
 5  yellow spool you were referring to on page
 6  sixty-seven of the book I just cited, correct?
 7       A.   Uh-huh.
 8       Q.   So if I understand you correctly
 9  you are saying you based your quilt, which is
10  Exhibit 3, on the yellow spool design in Janet
11  Kime's book on page sixty-seven?
12       A.   The idea of it.
13       MR. BUCKLEY:  I would just like to
14  object.  There is also instructions on how
15  to do that on two separate parts of the
16  book.  That's just a photograph of the
17  quilt.  The instructions are in two
18  separate parts of the book on how to do
19  that.
20       Q.   (By Ms. Thompson)  Just so I have
21  you testimony correct.  You are saying you based
22  yours on part on page seventy, the yellow
23  spools?
24       A.   Uh-huh.
```

---

Page 108

```
 1       Q.   If I understand you correctly, you
 2  did not base yours at all on the blocks that
 3  Mrs. Pelletier showed you how to make, whether
 4  they were six inches, three inches or whatever,
 5  in the quilting class?
 6       A.   I never looked back in there.
 7       Q.   Never looked back in there?
 8       A.   No.
 9       Q.   So it's pure coincidence, any
10  similarities what we agree on here, any
11  similarities between Exhibit 2 and Exhibit 3 are
12  pure coincidence?
13       MR. COYLE:  Objection.
14       Q.   (By Ms. Thompson)  Is that what
15  your testimony is?
16       A.   I made my quilt first.  I don't
17  know.
18       Q.   So you are saying if somebody finds
19  any part of this to be similar, it's just a
20  coincidence?
21       MR. COYLE:  Objection.
22       THE WITNESS:  No.  I made my quilt
23  first.
24       Q.   (By Ms. Thompson)  So you think she
```

---

Page 109

```
 1  copied you?
 2       A.   Yes.
 3       Q.   You think she saw yours first?
 4       A.   Yes, I do.
 5       Q.   So are you saying your quilt is
 6  original?
 7       A.   No.  My quilt is a courthouse step
 8  log cabin block that I drafted on a piece of
 9  graph paper when I was taking a rectangles only
10  class and I needed to make something with just
11  rectangles.
12       Q.   Did you submit that graph paper to
13  your attorney?
14       A.   No.  I never kept it.
15       Q.   So you never kept any of the
16  sketches?  Did you ever make any sketches?
17       A.   He has my notes.
18       MS. THOMPSON:  I don't think I have
19  seen those.
20       MR. COYLE:  Whatever I have gotten
21  has been produced.
22       Q.   (By Ms. Thompson)  Did you do any
23  trial and error sample blocks like Exhibit 4?
24       A.   Probably I did.
```

---

28 (Pages 106 to 109)

**SANDRA T. TALBOT**
**July 20, 2006**

Page 130

1   of commenting on another person's opinion
2   but --
3       MS. THOMPSON: I'm just going to
4   ask her from a factual stance. That's all
5   I'm going to ask her. Certainly I don't
6   think she needs to look at something in
7   advance in order to know what the truth
8   is.
9       Q.    (By Ms. Thompson) Directing your
10  attention to paragraph four. "During the 1990s"
11  Miss Roy writes "I took quilting classes from
12  JoAnn and was a member of the Log Cabin Club.
13  Sandy Talbot was also a member of the Log Cabin
14  club and attended some of the classes taught by
15  JoAnn."
16      Is there anything in there that
17  you dispute?
18      A.    No.
19      Q.    Paragraph five.
20      "JoAnn taught me and the other
21  students in the class the techniques to make the
22  small log cabin spools and showed the class the
23  "Sew Many Spools" design which she had made
24  using the very small finished logs."

Page 131

1       Do you dispute anything in
2   paragraph five?
3       A.    She may have showed the class, but
4   I didn't see it.
5       Q.    Whether you were there or you heard
6   about it, did you ever receive information that
7   indicated that JoAnn Pelletier showed the class
8   the very small finished logs?
9       A.    No.
10      Q.    And you never discussed the class
11  or discussed what was learned with your cousin
12  Connie Roy?
13      MR. COYLE: Objection.
14      THE WITNESS: I don't remember.
15      MR. BUCKLEY: Can I ask a question
16  or an objection here. You have here Sew
17  Many Spools design. The Sew Many Spools
18  design was the design you presented to the
19  copyright office in 2004, is that what
20  this is saying? That she gave something
21  that she didn't prepare until 2004 to
22  somebody in 1990? I'm confused as to what
23  you are saying Sew Many Spools.
24      MS. THOMPSON: We talked about

Page 132

1   these concepts extensively at the last
2   deposition. And what Mrs. Pelletier
3   testified to is that she had shown the
4   class the overall design, meaning the
5   second page of Exhibit 5. We do
6   understand that the title Sew Many Spools
7   was not formally registered until
8   September 17 of 2004.
9       However Ms. Roy understood the
10  design to be the Sew Many Spools design
11  and that's what she is referring to this
12  spool design as.
13      MR. BUCKLEY: So the affidavit says
14  that the document that was given to Ms.
15  Roy was a document that you have
16  identified as Exhibit?
17      MS. THOMPSON: Second page of
18  Exhibit 5.
19      MR. BUCKLEY: So it would be her
20  testimony that at the class she was given
21  that?
22      MS. THOMPSON: No. I cannot speak
23  to Ms. Roy relative to her testimony. All
24  I'm asking is factually does this witness

Page 133

1   agree or dispute what's in paragraph five.
2   Not what your interpretations are of it.
3   Not when Sew Many Spools was assigned as
4   the title of it. I'm simply asking word
5   by word what does she agree with, what
6   does she disagree with.
7       Q.    (By Ms. Thompson) Directing your
8   attention to paragraph five, Mrs. Talbot, is
9   there any part of that with which you agree or
10  disagree?
11      A.    Well, I never saw her making small
12  log cabin spools and I never saw that paper.
13      MR. COYLE: For the record I object
14  to the last question.
15      Q.    (By Ms. Thompson) So it's your
16  testimony that even though Ms. Roy says in
17  paragraph five that she saw the overall log
18  cabin design in the classes, the Log Cabin Club
19  classes that she attended, that in fact you
20  didn't, you weren't there?
21      MR. COYLE: Objection to
22  characterization. That isn't exactly what
23  paragraph six says. I think we
24  established that we don't actually know

34  (Pages 130 to 133)

**SANDRA T. TALBOT**
**July 20, 2006**

| Page 134 |
|---|

1  what paragraph six says.
2      MS. THOMPSON: We are looking at
3  paragraph five.
4      MR. COYLE: I'm sorry. Paragraph
5  five. Because as we sit here today my
6  understanding is we don't know what Ms.
7  Roy meant when she said Sew Many Spools.
8      MS. THOMPSON: That is true. I
9  can't speak for what was in Ms. Roy's
10  mind.
11      Q.   (By Ms. Thompson) Directing your
12  attention to paragraph six.
13      "Sometime after teaching the class
14  to making the Sew Many Spools design." Assuming
15  for the purposes of this question that it is the
16  overall compilation of the Sew Many Spools
17  arrangement that is Exhibit 2, "Sandy" meaning
18  Mrs. Talbot, "displayed her quilt top which she
19  had made to look like JoAnn's. There is no
20  doubt in my mind that JoAnn's spool design was
21  made before Sandy's."
22      Do you agree, disagree, what do you
23  agree with or disagree with Mrs. Talbot?
24      A.   I did not make my quilt design to

| Page 135 |
|---|

1  look like hers because I had not seen hers
2  before.
3      Q.   Is it fair to say you had seen
4  parts of the overall design that Mrs. Pelletier
5  created?
6      MR. COYLE: Objection.
7      THE WITNESS: The two papers.
8  Yes. Just those two papers.
9      MR. COYLE: There is a couple of
10  two paper documents. I want to make sure
11  you identify by exhibit number.
12      THE WITNESS: Seven.
13      Q.   (By Ms. Thompson) And in addition
14  to those two papers you had seen the blocks
15  that are log cabin blocks made to look like
16  spools?
17      A.   I saw those blocks. Six inch
18  blocks.
19      Q.   You are pointing to a design, a
20  sketch on page two of seven and you are saying I
21  saw those designs, meaning the block of four
22  that are on the second page?
23      A.   Right. I think they were sewn
24  together, but I can't be sure about that. But I

| Page 136 |
|---|

1  think she did have them sewn together in the
2  bigger blocks.
3      Q.   So you think she had sewn together
4  four blocks?
5      A.   Yes.
6      Q.   So you did see those and you did
7  have the documents that are Exhibit 7?
8      A.   I did.
9      Q.   So do you have any reason to
10  believe that Ms. Roy is not telling the truth in
11  this affidavit?
12      MR. COYLE: Objection.
13      THE WITNESS: I don't know why she
14  would say that. She knew I made the quilt
15  for Joanne Parisi's class. She knew why I
16  made the quilt, where I made it, when I
17  made it and why I made it. I didn't make
18  it to look like any of this.
19      Q.   (By Ms. Thompson) Did you have any
20  discussion with Ms. Roy relative to the making
21  of your spool quilt?
22      A.   I don't remember if I did or not.
23      Q.   So why do you think she knew you
24  made the quilt?

| Page 137 |
|---|

1      A.   She knew I was in Joanne Parisi's
2  class. We had to do a rectangle quilt. I think
3  I might have said I'm doing a rectangle
4  courthouse step.
5      Q.   When is the last time you spoke to
6  Ms. Parisi?
7      A.   It's been quite a few months.
8      Q.   So time in '06?
9      A.   Probably yes.
10      Q.   And you are saying you made Exhibit
11  3 in the class taught by Ms. Parisi?
12      A.   Yes, I did.
13      Q.   Physically made it right there in
14  that class?
15      A.   No. We had a class once a month.
16  She gave you an assignment. You went home and
17  you made the quilt.
18      Q.   In what year?
19      A.   Mid-nineties. Probably '95, '96.
20      Q.   Where could I find Ms. Parisi
21  today? Is she in the West Springfield area?
22      A.   No. She lives in Springfield.
23      Q.   Do you know the address?
24      A.   No.

**CATUOGNO COURT REPORTING SERVICES**
**Springfield, MA   Worcester, MA   Boston, MA   Lawrence, MA   Providence, RI**

SANDRA T. TALBOT
July 20, 2006

| Page 138 |
|---|

```
 1    Q.    Do you know the phone number?
 2    A.    I don't.
 3    Q.    Going back to Ms. Roy's affidavit,
 4  paragraph seven. "Sandy" meaning Mrs. Talbot,
 5  "told JoAnn" meaning Mrs. Pelletier, "that she
 6  was considering sending the design to a
 7  publisher, but JoAnn told her she could not do
 8  that."
 9         Is that an accurate statement?
10    MR. COYLE: Objection.
11    THE WITNESS: It's not. No. I
12  had received the letter from Chitra right
13  after the quilt show in 2000, and my
14  daughter was getting married in June of
15  2001 and I spent the entire year 2000
16  planning for a very, very large wedding.
17  And I never even thought about this
18  letter. I didn't even think twice. I
19  never -- it was the last thing on my
20  mind. I had cakes and caterers and all
21  sorts of things to worry about.
22         And they kept sending letters and
23  sending letters and I kept sticking them
24  over on the side.
```

| Page 139 |
|---|

```
 1    Q.    (By Ms. Thompson) So you are
 2  saying you never told Mrs. Pelletier that you
 3  were considering sending your design to a
 4  publisher?
 5    A.    I said I had no intention at that
 6  time. I remember saying I haven't even thought
 7  about it. All I have been doing is working on
 8  the wedding.
 9    Q.    Did you have a discussion with Mrs.
10  Pelletier relative to sending your design,
11  meaning Exhibit 3, to a publisher at any time?
12    A.    I'm not sure. I don't
13  specifically remember.
14    Q.    You don't know if you ever talked
15  about it?
16    A.    I said that I had received the
17  letter. I said that in the Log Cabin Club.
18    Q.    You told Mrs. Pelletier that?
19    A.    I did.
20    Q.    What did she say to you about that?
21    A.    She said the gal from Enfield
22  wasn't going to send her quilt.
23    Q.    So you told her that you were
24  considering sending --
```

| Page 140 |
|---|

```
 1    A.    I didn't say I was considering
 2  sending it. I just said I received a letter.
 3    Q.    Did you tell her what the letter
 4  was about? Which quilt it was about?
 5    A.    She knew what the letter was about.
 6  Three people had gotten a letter from Chitra.
 7    Q.    After this quilt show?
 8    A.    Yes. The lady in Enfield and my
 9  friend Jan and myself.
10    Q.    Did you tell Mrs. Pelletier which
11  quilt you were referring to?
12    A.    I guess I must have, yes.
13    Q.    And she had no response to you
14  about that?
15    MR. COYLE: Objection.
16    THE WITNESS: Well, she was
17  reading little blurbs about copyright
18  infringement to us. And my understanding
19  of why she was doing that is because she
20  had taken other people's patterns and was
21  teaching them in class. I thought she was
22  worried about being sued.
23         And the one thing she would say to
24  me was don't ever use my name in
```

| Page 141 |
|---|

```
 1  conjunction with one of her patterns.
 2    Q.    (By Ms. Thompson) So the second
 3  sentence of paragraph seven.
 4         "I also remember JoAnn handing out
 5  and reading material to the class regarding
 6  copyright laws and how they pertained to her
 7  quilting classes."
 8         Is that an accurate statement?
 9    A.    It is.
10    Q.    "Sandy was in the class when the
11  copyright discussion occurred."
12         Is that an accurate statement?
13    A.    That was, yes. I don't know how
14  many times she discussed it but I was there for
15  some of them, yes.
16    Q.    And you think that she was telling
17  you about the copyright law because she was
18  afraid of being sued?
19    A.    Yes.
20    Q.    Why would she be telling the
21  class if she was afraid?
22    A.    Because she had taken other
23  people's patterns right out of the book or
24  magazine or whatever and copied them, handed
```

36 (Pages 138 to 141)

# SANDRA T. TALBOT
# July 20, 2006

## Page 258

1    I, TACY A. MALANDRINOS, a Notary Public in
2  and for the Commonwealth of Massachusetts, do
3  hereby certify that SANDRA T. TALBOT appeared
4  before me and satisfactorily identified herself
5  on July 20, 2006 at the offices of DOHERTY,
6  WALLACE, PILLSBURY and MURPHY, P.C., 1414 Main
7  Street, 19th Floor, Springfield, Massachusetts,
8  and was by me duly sworn to testify to the truth
9  and nothing but the truth as to her knowledge
10  touching and concerning the matters in
11  controversy in this cause; that she was
12  thereupon examined upon her oath and said
13  examination reduced to writing by me; and that
14  the statement is a true record of the testimony
15  given by the witness, to the best of my
16  knowledge and ability.
17    I further certify that I am not a relative
18  or employee of counsel/attorney for any of the
19  parties, nor a relative or employee of such
20  parties, nor am I financially interested in the
21  outcome of the action.
22  WITNESS MY HAND this 7th day of August, 2006.
23  Tacy A. Malandrinos    My Commission expires:
24  Notary Public         May 24, 2013

## Page 259

1  Today's Date: August 7, 2006
2  To: Steven M. Coyle, Esq.
3  Copied to: Attorneys Thompson and Buckley
4  From: Tacy Malandrinos
5  Deposition of: SANDRA T. TALBOT
6  Taken: July 20, 2006
7  Action: JOANN PELLETIER
8      v. SANDRA T. TALBOT, CHITRA
9      PUBLICATIONS, et al.
10
11    Enclosed is a copy of the deposition of
12  SANDRA T. TALBOT. Pursuant to the Rules of
13  Civil Procedure, Mrs. Talbot has thirty days to
14  sign the deposition from today's date.
15    Please have Mrs. Talbot sign the
16  enclosed signature page. If there are any
17  errors, please have her mark the page, line and
18  error on the enclosed correction sheet. She
19  should not mark the transcript itself. The
20  certification and addendum should be forwarded
21  to all interested parties.
22    Thank you for your cooperation in this
23  matter.
24

## Page 260

1      THE UNITED STATES DISTRICT COURT
2      DISTRICT OF MASSACHUSETTS
3  WESTERN DIVISION     3:05-CV-30109-MAP
4
5  * * * * * * * * * * * * * * * * * *
   JOANN PELLETIER,          *
6        Plaintiff    *
   V.                 *
7                     *
   SANDRA T. TALBOT, CHITRA    *
8  PUBLICATIONS, CHARIOT PUBLISHING, *
   INC. As General Partner of Chitra *
9  Publications, CHRISTIANE MEUNIER, *
   As Officer of Chariot       *
10  Publishing, Inc., CHRISTIANE   *
   MEUNIER, As Owner of Chitra   *
11  Publications, and CHRISTIANE   *
   MEUNIER d/b/a MOON OVER MOUNTAIN, *
12        Defendants   *
   * * * * * * * * * * * * * * * * * *
13
14
15    I, SANDRA T. TALBOT, do hereby certify,
16  under the pains and penalties of perjury, that
17  the foregoing testimony is true and accurate, to
18  the best of my knowledge and belief.
19    WITNESS MY HAND, this   day of     ,
20  2006.
21
22    _____
23      SANDRA T. TALBOT
24

## Page 261

1      CORRECTION SHEET
2  DEPONENT: SANDRA T. TALBOT
3  CASE: JOANN PELLETIER V. SANDRA T. TALBOT,
4      CHITRA PUBLICATIONS, et al
5  DATE TAKEN: July 20, 2006
6  ***********************************************
7  PAGE / LINE / CHANGE OR CORRECTION AND REASON
8  ***********************************************
9  ____/____/_____
10  ____/____/_____
11  ____/____/_____
12  ____/____/_____
13  ____/____/_____
14  ____/____/_____
15  ____/____/_____
16  ____/____/_____
17  ____/____/_____
18  ____/____/_____
19  ____/____/_____
20  ____/____/_____
21  ____/____/_____
22  ____/____/_____
23  ____/____/_____
24  ____/____/_____

66 (Pages 258 to 261)

# Exhibit C

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS


```
-----------------------------)
JO ANN PELLETIER              )
        Plaintiff(s),         )
VS                            )  Civil Action No.
                              )   05-30109-MAP
CHITRA PUBLICATIONS and       )
SANDRA T. TALBOT              )
        Defendant(s).         )
-----------------------------)
```


DEPOSITION Of:  JO ANN PELLETIER
DATE:           June 21, 2006
HELD AT:        CANTOR COLBURN
                55 Griffin Street
                Bloomfield, Connecticut


Reporter:  JENNY C. EBNER, RPR, LSR 00030.
  BRANDON SMITH REPORTING SERVICES, LLC
          44 Capitol Avenue
          Hartford, CT. 06106
           (860) 549-1850

Brandon Smith Reporting Service
44 Capitol Avenue              Six Landmark Square, 4th Floor
Hartford, CT 06106                 Stamford, CT 06901
(860) 549-1850                        (203) 316-8591
(800) 852-4589                        (800) 852-4589

Brandon Smith Reporting Service, LLC

Page 50

1     MR. COYLE:  I am going to switch
2   gears so let's take a 10-minute break
3   and we will come back and resume.
4
5       (Whereupon, a recess was taken from
6   10:36 o'clock a.m. until 10:45 o'clock
7   a.m.)
8
9   BY MR. COYLE:
10    Q  Ms. Pelletier, at some point in time did
11  you apply to the United States Copyright Office
12  for copyright registration on either a quilt
13  design and/or a quilt pattern that you maintain
14  you have created?
15    A  Yes.
16    Q  Okay.  How many times in your life or
17  your career in quilting have you applied to the
18  United States Copyright Office for a copyright
19  registration?
20    A  I applied -- there was two tote bags
21  that I have copyrights for, and there are some
22  toy animals that -- that I actually sent in for
23  the registration, and several dolls.
24    Q  Okay.
25    A  And some toys.  But there is others that

Page 51

1   I have made, just I never actually sent in for
2   the registration.
3     Q  Okay.  The dolls that you just
4   referenced that you sent in, did you actually get
5   a certificate of registration for those?
6     A  Yes.
7     Q  Okay.
8     A  And the tote bags.
9     Q  Other than the tote bags and dolls or
10  toys you just mentioned, other than with respect
11  to, obviously, the quilt and pattern that are at
12  issue in this case, is there anything else you
13  applied for copyright protection for from the
14  United States Copyright Office?
15    A  No.
16    Q  So the only quilt design and/or quilt
17  pattern which you have sought a registered
18  copyright registration is the one at issue in
19  this case?
20    A  Yes.
21    Q  All right.  I am going to show you,
22  Ma'am, what we have marked as Exhibit 2, and I
23  will represent to you this bears Bates numbers
24  PEL001 through PEL002?
25

Page 52

1       (Pelletier Exhibit 2:
2       Marked for identification.)
3
4   BY MR. COYLE:
5     Q  I ask if you recognize that document?
6     A  Yes.
7     Q  What do you understand that document to
8   be?
9     A  That document is where I sent,
10  officially sent in my -- sent in to register my
11  copyright on something, a quilt that I had
12  designed in 1993.
13    Q  Okay.  And is it fair to say that you
14  applied for this copyright registration on
15  September 17, 2004?
16    A  That's when they received it.
17    Q  Okay.  In connection with your
18  application for a copyright registration did you
19  also submit some materials to the copyright
20  office?
21    A  Yes.
22    Q  Do you recall what you submitted?
23    A  A pattern in a plastic envelope.  It was
24  the pattern and instructions with a picture on
25  the front.

Page 53

1       And I also enclosed some additional
2   papers that I had when I -- that I used when I
3   was teaching, teaching in my quilting
4   classes.  I included them in with the package.
5     Q  You said pattern and instructions as
6   well as a picture; what was the picture of?
7     A  My spool quilt.
8     Q  Okay.  The one that you call Sew Many
9   Spools?
10    A  Correct.
11    Q  That is So Many Spools?
12      MR. COYLE:  Let's mark that as the
13  next exhibit.
14
15      (Pelletier Exhibit 3:
16      Marked for identification.)
17
18  BY MR. COYLE:
19    Q  I am going to show you what we've marked
20  as Exhibit 3, which is a letter from one of your
21  attorneys, Debra Basile, to me, dated December
22  10, 2004, with a series of attachments to it.
23  And I ask if you ever seen that before?
24    A  Yes.
25    Q  Okay.  You are cc'd on this letter.

Page 90

1  spools, and that's what the connection was with
2  this.
3       My spool was something I was making, my
4  spool quilt, what I was making for myself that I
5  shared with my class as like an extra extra
6  bonus.
7       Q  Okay.  I guess my question, though, was:
8  Was it -- put aside the reasons why.
9       A  Okay.
10      Q  Was it specifically for purposes of
11  providing this document, TAL00011, to the
12  copyright office that you deleted the reference
13  to Ms. Kime?
14      A  I am not sure how to answer that,
15  because --
16      Q  In other words --
17      A  That reference had nothing to do with
18  what I was copyrighting.
19      Q  I understand that.  I guess what I am
20  asking is: Prior to when you prepared this
21  document, TAL00011, to be filed with the
22  copyright office, had you ever deleted the
23  reference to Ms. Kime before?
24      A  I don't think so.
25      Q  Okay.  So it was only when you were

Page 91

1  getting ready to file this piece of paper with
2  the copyright office that you deleted that
3  reference to Ms. Kime.  Correct?
4       A  I hadn't taught with this particular
5  paper.
6       Q  Ma'am, I appreciate there may be a
7  variety of reasons for this.  I am just asking
8  you if it was --
9       A  That's hard.
10      Q  Whatever the reasons it was when you
11  brought this piece of paper out for purposes of
12  sending it to the copyright office that you first
13  deleted the reference to Ms. Kime.  Correct?
14      MS. THOMPSON:  If you can answer it,
15  go ahead.
16      THE WITNESS:  I can't give you an
17  absolute yes on that, because it may
18  have been that it might have been
19  deleted earlier.
20      It would have been when I was
21  teaching the spool classes and it was
22  going to be with the pinwheel, yes, it
23  was still on there.
24      Yes, I guess it would be when it
25  went into Washington, because then this

Page 92

1  paper had no connection with what my
2  class lesson was that day.
3  BY MR. COYLE:
4       Q  When you say "Washington," you mean --
5       A  Copyright, yes.
6       MR. BUCKLEY:  Mark that, please.
7  BY MR. COYLE:
8       Q  Okay.  Let's look at the next page of
9  the packet you sent to Washington D.C..  What is
10  this page?
11      A  This is when I was preparing for my
12  class in January of -- January 21st of 1993, in
13  my preparation when I had made the small Log
14  Cabin -- I mean the small Court House Step spool,
15  and I thought, Wow, that is really great.  Then I
16  started to -- I said that I am going to make a
17  quilt of my own like that.
18      And this is the paper that I had drawn
19  of what I was going to make, of what I was
20  making.
21      I had started making blocks for my quilt
22  design in January 1993, and when I went into
23  class I had this (indicating) paper with me in my
24  class.
25      Q  Okay.  How many -- how many blocks for

Page 93

1  this quilt design had you made by January 21st,
2  1993?
3       A  As of January, 1993 I had 10 blocks made
4  for my quilt design, for my Sew Many Spools.  It
5  did not have the name "Sew Many Spools" until I
6  sent it into Washington, but should I refer to it
7  as Sew Many Spools if I am referring to --
8       Q  That is fine.  We will know what you are
9  talking about.
10      A  Okay.  All right.
11      MR. BUCKLEY:  Mark that as well.
12  BY MR. COYLE:
13      Q  You said you had 10 blocks made.  Were
14  they assembled in any way to each other or were
15  they blocks much like we see on the table here, a
16  series of --
17      A  At that time they were not assembled
18  together.  They were individual blocks.
19      Q  Did you show any of those blocks to the
20  class on January 21st, 1993?
21      A  Yes.
22      Q  Incidentally, would the blocks you
23  showed your class on January 21, 1993 basically
24  look like what we have marked as Exhibit 9?
25      A  They are the ones in my quilt.  So Many

24 (Pages 90 to 93)

| Page 134 | Page 136 |
|---|---|

**Page 134**

1    A  I have the notation the same time I
2  added the red border. I evidently didn't have
3  time. I had a heavy teaching schedule and did
4  things as I could.
5    Q  Okay. The final quilt top, as it
6  appears in Exhibit 6, which was what was sent to
7  the copyright office --
8    A  Correct.
9    Q  -- was completed on January 27, 1998?
10    A  Yes. I want to be sure. That looks
11  like a one or --
12    Q  Let me give you something that might
13  help with that.
14    A  One or seven.
15    Q  Let me show you what I have marked as
16  Exhibit 14.
17    A  See, I said -- was that a one or seven?
18  See? I just said that to you. It was a seven.
19    Q  Okay. Hold on. Let me --
20    A  Okay.
21    Q  We will clear this up. I have just
22  shown you what is marked as Exhibit 14. Again,
23  these are handwritten notes; those are your
24  handwriting?
25    A  (Nodding head.)

**Page 136**

1  1998, that was because you were struggling to
2  read?
3    A  Whether it was a one or --
4    Q  Now you are certain this was finished on
5  July the 27th, 1998?
6    A  That's --
7    Q  At the top at least?
8    A  Yes.
9    Q  Also, on Exhibit 14 you see where it
10  says 9/11/2004, false binding for pictures?
11    A  Yes.
12    Q  That's a reference to the false binding
13  that you testified to earlier today that you did
14  for purposes of photographing the quilt or quilt
15  top and sending pictures to the copyright office?
16    A  Yes.
17    Q  Up at the top left of Exhibit 14 you see
18  there is an entry dated October 2, 2004?
19    A  Yes.
20    Q  I am sorry, what is that entry
21  representing?
22    A  It says, "Slightly T-dyed, layered and
23  basted."
24    Q  Okay. I am going to show you Exhibit
25  15, which, once again, is a handwritten series of

| Page 135 | Page 137 |
|---|---|

**Page 135**

1    Q  Again, so the record is clear, no Bates
2  number on this because this was something you
3  just brought today. Do I understand correctly
4  that this represents a note that you had, at
5  least for some period of time, kept pinned to the
6  quilt that you were working on?
7    A  The yellow one was -- yes, this wasn't
8  pinned to anything.
9    Q  I am just talking about Exhibit 14, and
10  again, for the record --
11    A  Yes.
12    Q  -- because it's not the original. When
13  you say "yellow" that won't be clear.
14    A  Okay. Yes.
15    Q  To be clear, Exhibit 14, for some period
16  of time, was pinned to the quilt as you were
17  working on it?
18    A  Yes.
19    Q  Okay. Does that indicate the date at
20  the top that it was completely finished including
21  the borders?
22    A  Yes.
23    Q  What was that date?
24    A  July 27, 1998.
25    Q  So earlier when you said January 27,

**Page 137**

1  notes; is that your handwriting?
2    A  Yes.
3    Q  Okay. Again, there is no Bates number
4  because this was something that you brought
5  today.
6       Would you agree that this is a
7  handwritten note that you have currently pinned
8  to the back of the quilt which is Exhibit 12?
9    A  Yes.
10    Q  And does this note indicate the date
11  that the entire quilt was completed?
12    A  It was machine quilted, and the binding
13  put on, and it was complete as of the 14th of
14  October, 2004.
15    Q  All right. Earlier today we were going
16  over some of the materials that you showed to
17  your class on January 21st, 1993?
18    A  Uh-huh.
19    Q  Other than what has been either labeled
20  as exhibits or otherwise discussed here today, is
21  there anything else related to either the pattern
22  that you are now claiming copyright protection
23  for or design that you are now claiming copyright
24  protection for that you showed to your class
25  January 21st, 1993?

Pelletier v. Chitra Publications

6/21/2006                                                                    Jo Ann Pelletier

| Page 170 |
|---|

1  at the same time.
2  BY MR. COYLE:
3      Q  Okay.  So, other than what you have told
4  us already, what, if anything, else did you and
5  Sandy discuss on this particular class where
6  Sandy showed a quilt that you felt looked like
7  yours?
8      A  I didn't go into any bigger discussion.
9  It was where I confronted her on it and said --
10  she said that she didn't do it in my class, and I
11  said, "But you learned it from me."
12      We don't do any sewing in the class.  I
13  am the only one that demonstrates.  They go home
14  and do their own sewing.  I was surprised.  I
15  didn't know she had made one.  I had no
16  indication she was making one.
17      Q  Did she say anything that day about when
18  she had made it?
19      A  No.
20      MR. COYLE:  Claire, to maybe speed
21      this along so I don't have to hash out
22      too much stuff with Ms. Pelletier, does
23      Connie Roy have a recollection as to the
24      date of this class?
25      MS. THOMPSON:  No.  She is one of

| Page 171 |
|---|

1      the individuals I listed in our --
2      MR. COYLE:  That is fine.
3  BY MR. COYLE:
4      Q  Ms. Pelletier, after this class where
5  Ms. Talbot showed her quilt top that you felt
6  looked like your quilt design, did you ever have
7  subsequent conversations with her about her quilt
8  top?
9      A  Yes.
10      Q  Okay.  When was the next discussion?
11      A  Next discussion on that would have been
12  March of 2000.  She called me one day, and there
13  was a quilt guild that we belonged to that was
14  having a quilt show, and she said she was going
15  to put that quilt into the Pioneer Valley
16  Quilters quilt show.
17      Q  The quilt that looked a little bit like
18  your quilt?
19      MS. THOMPSON:  Objection to the
20      form.
21      THE WITNESS:  Yes.
22  BY MR. COYLE:
23      Q  I will reask the question.  The quilt
24  you believe looked like your quilt?
25      A  Yes.  She called me up, and she said

| Page 172 |
|---|

1  that she was going to -- she was just tying the
2  quilt, and my assumption was she was tying it
3  where the cornerstones were, but she said it
4  wasn't coming out right because when she -- when
5  it was going to hang up it was going to all sag.
6      I said to her, yes, that is because it
7  needs to have something more than just -- it's
8  all right if it's on a bed, but if it's hanging
9  in quilt show it's going to have to have
10  something to hold it together.
11      She said, "Oh," she says, "I don't
12  machine quilt," and was talking about herself,
13  she didn't machine quilt.  And she asked me if I
14  would machine quilt it for her.  I told her no.
15      Then she said -- well, the conversation
16  got around to her saying that well, she didn't
17  know how to quilt it.  I told her to quilt it on
18  the outside of the sashing, and go this way
19  (indicating) top and bottom of the sashing, and
20  this way (indicating) top and bottom, and the
21  whole quilt would hold.
22      Q  For the record you are saying "this way"
23  and "this way" vertical and horizontal?
24      A  Vertical and horizontal, outside of the
25  stitching where the sashing and spools are sewn

| Page 173 |
|---|

1  together from top to bottom or from, you know,
2  east to west.
3      Then I said that would be enough,
4  because the spools would then stand out.
5      So she said, "Well, I will give it a
6  try."  Then I heard no more about it.
7      Q  Okay.  All right.  Just if you go
8  to Exhibit 16, which is your interrogatory
9  answers, and go to page 3, and at the bottom
10  there is a reference to -- do you see -- in big
11  capital letters it says -- I guess it's supposed
12  to say "quilting," I guess.  It's looks like a
13  nine missing there.
14      But you see there is a reference to
15  "Talbot called me before the 2000 quilt show?"
16  Do you see that?
17      A  It was tied with buttons.  I had
18  forgotten that until I read this.
19      Q  I want to confirm this portion of this
20  interrogatory answer at the bottom of page 3 is a
21  reference to the same conversation with
22  Ms. Talbot that you were testifying to; is that
23  correct?
24      A  Yes.
25      Q  Why did you refuse to machine quilt it

44 (Pages 170 to 173)

| Page 174 |
| --- |

```
 1   for her?
 2       A   I didn't have time.
 3       Q   Okay.
 4       A   I don't have my own stuff done.
 5       Q   Okay.  When is the next time, if there
 6   was a next time, that you discussed the issue of
 7   Ms. Talbot's quilt that you felt looked similar
 8   to your quilt?
 9       A   After the quilt show.  And I don't know
10   exactly -- I had gone to the quilt show and saw
11   the quilt in the quilt show.  And then after --
12   sometime after the quilt show she called me, and
13   she was all excited because the magazine Chitra
14   sent her a letter that they wanted to put her
15   quilt in the magazine.
16       Q   Okay.
17       A   She told me that.  I said to her -- I
18   confronted her then over the phone and said to
19   her, "Sandy, you did not give any credit to me in
20   the quilt program."
21           And she said -- I don't remember --
22   well, she didn't give any credit to me, and I
23   said to her -- I said, "It's not yours to give
24   away," because I said -- you know, during our
25   conversation it was -- well, I was familiar with
```

| Page 175 |
| --- |

```
 1   the magazine, because I subscribe to it, and I
 2   said that they want your -- they probably want it
 3   to make a pattern for their magazine, and I told
 4   her no.
 5       Q   Okay.  Just going back for a second to
 6   the conversation that you had with Ms. Talbot
 7   leading up to that 2000 quilt show --
 8       A   Uh-huh.
 9       Q   -- is there anything else that you and
10   she discussed on that occasion, other than what
11   is in your interrogatory answer or what you have
12   told us about here today?
13       A   About her quilt?
14       Q   Anything related to her quilt at all.
15           MS. THOMPSON:  She probably would
16       have to read the whole set of
17       interrogatories, Steven, in order to
18       answer that accurately.
19           MR. COYLE:  She can read whatever
20       she wants.  I will note that I think
21       that in these interrogatories the
22       subject of that particular conversation
23       is limited to the very bottom of page 3,
24       to very top of page 4, although, again,
25       I would encourage her to read as much as
```

| Page 176 |
| --- |

```
 1   she would like to read here.
 2           THE WITNESS:  She called about what
 3       she could do about it not looking good,
 4       and would I quilt it for her.  And she
 5       didn't know how to quilt it.  And I told
 6       her even how to quilt it.
 7           That's basically what our
 8       conversation consisted of.
 9   BY MR. COYLE:
10       Q   Other than what you testified here
11   today, and what is in this interrogatory answer,
12   that's it to the best of your recollection?
13       A   That's all.
14       Q   Everything that was discussed during
15   that conversation?
16       A   That's all I remember.
17       Q   Okay.  Coming back now to the discussion
18   following the quilt show where she had -- she had
19   been approached by Chitra Publications you just
20   relayed to us what your feelings were about that.
21   Was there anything else discussed during that
22   conversation other than what you just told us?
23       A   About that quilt, about her quilt that
24   she had made?
25       Q   Yes.
```

| Page 177 |
| --- |

```
 1       A   I told her it was not hers, it was my
 2   design, and I'd taught it to her.  And she said
 3   to me, "It's just a Court House Step."
 4           I said, "It's more than that Court House
 5       Step.  It's what you put with the Court House
 6       Step to make the appearance of the quilt, how
 7       it's going to look."
 8           She kept saying, "It's just a Court
 9   House Step."
10           I said -- that was basically -- that was
11       basically our discussion.  I told her -- you
12       know, we argued about it.
13       Q   How long did that conversation last?
14       A   I don't know.  It could have lasted 15
15   or 20 minutes, something like that.
16       Q   Okay.  That's just a guess, though?  I
17   mean, it's fine if you don't remember.
18       A   We had several conversations over -- in
19   the next month or two.  Well, actually, now, this
20   might have been April and May.  We didn't discuss
21   it anymore after that until September.
22           I would say to her -- so it could have
23   lasted more than 15 or 20 minutes.  I don't know
24   which conversation, because I said to her -- I
25   can actually kind -- I will combine whatever our
```

Brandon Smith Reporting Service, LLC

Page 206

1  any of that with the patterns for the quilt that
2  was Exhibit 12?
3      A  There were a few other things, too, that
4  are my own, and yes.
5      Q  Well, I just want to be clear here.  I
6  am talking specifically about the pattern which
7  is Exhibit 12?
8      A  It would have been part of -- if I did a
9  book, it would have been part of a book.
10         (Pause.)
11     Q  Let me ask you -- Ms. Pelletier, I am
12  going to ask you a very specific question.
13     A  Okay.
14     Q  Specific question is:  Did you have any
15  specific plans to in any way market, in any way,
16  at all?
17     A  At some point I was going to market -- I
18  am sorry.
19     Q  That's okay.  Apologize.  The pattern
20  for your quilt which we have identified as
21  Exhibit 12?
22     A  Are you asking me as of a certain time
23  or -- it was my intent at some time with things
24  that were my techniques of how to make or my
25  designs that I would do something with them at

Page 207

1  some point.
2      Q  At any time prior to when Chitra
3  Publications issued a magazine that contained
4  photographs and other information about the quilt
5  that Ms. Talbot made, had you formulated a
6  specific plan to market the pattern for the quilt
7  that is Exhibit 12?
8      A  I don't know when it was that I did it.
9      Q  To this day, have you ever formulated
10  any specific plan to market that pattern?
11     A  No.  I have been very disillusioned
12  right now.  Doesn't mean I won't, though.
13     Q  Okay.
14     A  I have had sicknesses since that
15  magazine came out in '03, too.  I had bleeding
16  ulcers and was put in the hospital for four days.
17     Q  Okay.  Is there any other economic
18  injury that you allege to have sustained as a
19  result of any acts that you claim Ms. Talbot
20  committed that are wrongful?
21     A  No.
22     Q  Okay.
23     A  But she willfully did it.
24     Q  As you sit here today, have you
25  undertaken in any way at all to calculate or

Page 208

1  quantify any economic injuries that you have
2  sustained as a result of any acts committed by
3  Ms. Talbot?
4      A  I haven't thought about that.
5      Q  That would be a no?
6      A  No, I haven't thought about it.  Except
7  for the fact she took the edge off of it being my
8  original design, being given -- being available
9  to the world.
10     Q  Okay.  Have you had conversations with
11  anyone other than your lawyers about this lawsuit
12  and the issues implicated by this lawsuit?
13     A  Anybody that I have spoken to at all?
14     Q  Yes.  I will exclude your husband.
15     A  I haven't talked very much to him about
16  it at all.  He hasn't known a whole lot about it
17  because I knew --
18     Q  Your conversations with him actually are
19  privileged.
20     A  -- I knew if I was saying something to
21  him he would be upset that I was having to go
22  through this.  I figured it was better to not say
23  anything to him.
24     Q  Okay.
25     A  There are a few people.  Connie Roy

Page 209

1  knows what was going on during the whole thing.
2  She knows what was going on during 2002 from, you
3  know, April, May and through September, you
4  know -- I am sorry, 2000.  Not 2002.
5      Q  All right.  Is Connie Roy a friend of
6  yours?
7      A  She was in my classes.
8      Q  Was she a friend of yours?
9      A  Yes, she is a friend.  She is Sandy's
10  cousin, and we were friends.  We would see each
11  other at the quilt shops, and they were in my
12  class and that type of friend, and that type of
13  thing.
14     Q  Anyone other than Connie?
15     A  Two other women.  I mean that I told
16  that I was starting this lawsuit or something?
17     Q  And that you discussed any of the issues
18  in this lawsuit.
19     A  Okay.  It was Kay Mehan and another
20  woman in the group.  She is a friend, Gloria.  I
21  told them that --
22     Q  What is her last name?
23     A  Gloria Marchetto, M-a-r-c-h-e-t-t-o.
24     Q  Where is she residing?
25     A  West Springfield, Mass.  I told them --

Pelletier v. Chitra Publications

Page 234

1  sampler in the book, when I flipped through it.
2      Q  When you were given -- when Ms. Talbot's
3  attorney gave your attorney information, when you
4  did your discovery, he gave a copy of that book
5  to her.  He did a photocopy of the book.  Is it
6  your testimony your attorney did not give you a
7  copy of that book at that time?
8      A  I don't remember ever seeing it.  I
9  don't remember if it was in the packet.
10     Q  On number 7 you have a chart there?
11     A  Yes.  Right here (indicating).
12     Q  Okay.
13     A  Uh-huh.
14     Q  From where did you derive these -- where
15  was your idea for these size of blocks?
16     A  I was teaching a totebag class, and the
17  top one -- well, you can see the
18  six-and-a-half-inch finish block?  Two of those
19  sewn together would make a 12-inch block.  So
20  people could take four, six-and-a-half-inch
21  blocks, and you sew them together to make a
22  block, and you make a 12-inch one, and alternate
23  them in the quilt.
24         I kept some things so they would work
25  together.

Page 235

1          I was teaching a totebag class, and I
2  wanted a pocket that size to go on to my totebag,
3  and I made the 13-inch size.  It's never been --
4  you know, when I teach the totebag classes, I
5  would --
6      Q  What is the size of your center square
7  on that one?
8      A  Size of the center square was cut
9  seven-and-a-half-inches square.
10     Q  That was the one you did on the totebag?
11     A  A Totebag isn't totally finished.  It
12  had -- I taught -- I taught the totebag classes
13  at several different workshops and didn't always
14  get them finished.
15     Q  Can you look at the Kime book for me?
16     A  Sure.
17     Q  Would you look at page 45 -- excuse
18  me -- at page 42, and it
19  says -- section says, "Yellow Spools"
20     A  Yes.
21     Q  I am looking at that drawing, and I am
22  looking at the drawing you prepared on your
23  number 7.  Are you looking at those too?
24     A  I am looking at the two, and --
25     Q  Now, what size was "Yellow Spools to be

Page 236

1  cut?
2      A  One-inch blocks, one-inch finish.  That
3  means one and a half.
4      Q  Log width is what?
5      A  Let me see -- log width, one inch
6  finished it is saying here, so is this -- wait a
7  minute, now.
8      Q  It says how to cut it?
9      A  I am trying -- wait a minute.
10         I am looking to see where it's saying
11  how to cut it.  Cutting instructions.  Okay.  The
12  logs, one-and-a-half-inches wide.
13     Q  What is the finished block size?
14     A  Thirteen.
15     Q  Thirteen?
16     A  That's what she says.
17     Q  What is the unfinished log size?
18     A  What is the -- what did you say -- what
19  do you mean?
20     Q  Unfinished with the seam allowance?
21     A  That would be 13 and a half.
22     Q  What is yours here on your chart?  What
23  is the block size?
24     A  Same thing.
25     Q  Same thing.  What is the center square

Page 237

1  that she says to cut there?  What size?
2      A  I am looking.  Seven-and-a-half-inches
3  square.
4      Q  Seven-and-a-half-inches-square and what
5  is yours?
6      A  Seven and a half.
7      Q  What is her log width?
8      A  Cut one and a half.
9      Q  What is yours?
10     A  One and a half.
11     Q  What is the first round size going to
12  be?
13     A  Does she say in here?  Well, mine says
14  the first round, nine-and-a-half-inches square.
15  I don't know if she has that.  That's a technique
16  that I have.
17     Q  Would you look at page 70?  Would you
18  tell us what that depicts?
19     A  I did not see this in this book.
20     Q  Okay.  Now, I am looking at this quilt,
21  and I am looking at the center block of that wall
22  hanging.  Could you describe to us the center
23  block of that wall hanging, the elements of it?
24     A  It's spools, and then there is sashing
25  and cornerstones.

60 (Pages 234 to 237)

Brandon Smith Reporting Service, LLC

| Page 238 | Page 240 |
|---|---|
| 1  Q There is sashing and cornerstones. Are<br>2 these the same sashings and cornerstones that you<br>3 have in your drawing?<br>4  A Not the same ones, because I didn't see<br>5 this picture.<br>6  Q Uh-huh. I am asking if they are the<br>7 same or similar to the ones that you are claiming<br>8 is your original design?<br>9  MS. THOMPSON: Objection to the<br>10  form. If you can answer, go ahead.<br>11  THE WITNESS: I would say similar.<br>12 BY MR. BUCKLEY:<br>13  Q Turn to page 140, if you would, please,<br>14 in the Kime book.<br>15  A Okay.<br>16  Q Page 140, what is Ms. Kime attempting to<br>17 do in the highlighted areas? What is she<br>18 breaking down for you?<br>19  MS. THOMPSON: Objection. She can't<br>20  know what is in somebody else's mind,<br>21  but if you can answer, go ahead.<br>22  THE WITNESS: I don't know what you<br>23  mean.<br>24 BY MR. BUCKLEY:<br>'5  Q You are a quilt teacher. You said you | 1 quilt, is it not?<br>2  A Yes.<br>3  Q It's showing the border, is it not?<br>4  A Showing the Court House Step; it shows<br>5 sashing; showing cornerstone showing the log<br>6 cabin block like part of a border.<br>7  Q And you said that you only -- you said<br>8 that you reviewed and looked through a Janet Kime<br>9 book. As a matter of fact you said the pattern<br>10 was from Janet Kime Log Cabins. That's what<br>11 you wrote here. Correct?<br>12  MS. THOMPSON: Objection. That's<br>13  not what she said or not what she wrote.<br>14  MR. BUCKLEY: I will withdraw that.<br>15 BY MR. BUCKLEY:<br>16  Q Question: Did you contact Janet Kime<br>17 and ask her if you could copy out of her book?<br>18  A I didn't have her book.<br>19  Q Ma'am, I believe you testified before<br>20 you had a copy of Janet Kime's book.<br>21  A No.<br>22  Q You reviewed it somewhere?<br>23  A I didn't have a copy. I was at a<br>24 quilt -- at a quilt show, and I was looking<br>25 through it like this (indicating). |

| Page 239 | Page 24 |
|---|---|
| 1 were a quilt designer. What aspects is this<br>2 designer attempting to break down? Based on your<br>3 understanding of quilting, what is she attempting<br>4 to show?<br>5  MS. THOMPSON: Objection. You can<br>6  answer.<br>7  THE WITNESS: Well, this must be the<br>8  way she writes her books where she does<br>9  part of it, where she is showing the<br>10  actual quilt, and the other one is kind<br>11  of just showing drawings.<br>12 BY MR. BUCKLEY:<br>13  Q Just showing drawings? Are you stating<br>14 that you don't know what this means, these<br>15 highlighted areas?<br>16  A What do you mean by "highlighted"?<br>17  Q Highlighted areas. One portion of the<br>18 quilt is highlighted. There are bold lines drawn<br>19 around different elements of that quilt.<br>20  A Do you mean up here, up in the upper<br>21 left corner?<br>22  Q Yes. There are highlighted bold lines.<br>23  A It's showing where the blocks -- it's<br>24 showing the blocks, their makeup.<br>25  Q Showing various elements of this figure | 1  MS. THOMPSON: Let the record<br>2  reflect she is looking through the<br>3  pages.<br>4  THE WITNESS: Looking through the<br>5  pages.<br>6 BY MR. BUCKLEY:<br>7  Q Ms. Pelletier, isn't it true the two<br>8 quilt shops where you taught Log Cabin classes<br>9 sold this book?<br>10  A I don't know, because I never went by<br>11 that -- I never went there to buy it. I don't<br>12 know every book they sell. I don't know.<br>13  Q Is it your testimony that you, being an<br>14 expert in quilting classes on Log Cabin quilts<br>15 and teaching courses, didn't review this book?<br>16  A I did at a quilt show. I was looking at<br>17 it. I flipped through it.<br>18  Q You admit you had access to this book?<br>19  A Only to flip through the pages. I did<br>20 not --<br>21  Q I am going to turn your --<br>22  A When I am flipping through, I wasn't --<br>23  Q There is no question.<br>24  MS. THOMPSON: There is no question.<br>25 BY MR. BUCKLEY: |

Brandon Smith Reporting Service, LLC

6/21/2006                                                                                        Jo Ann Pelletie

| Page 242 |
| --- |

1    Q  You have all the exhibits.  May I see
2  the exhibits?  Who has the pile of exhibits?
3          MS. THOMPSON:  Exhibits?
4          THE WITNESS:  Put that away.
5  BY MR. BUCKLEY:
6    Q  Showing you Exhibit Number 10, from
7  where did you get the idea to turn those?
8    A  From this book.
9    Q  From this book.  You got the idea to do
10  what?
11    A  To have the spools -- it's a colored
12  section that you look through.  If I am at a show
13  deciding to look -- if I am anywhere, a quilt
14  show, shop or whatever to buy a book, I don't
15  like this area, I find the part where the
16  pictures are, and I go through that.  And when I
17  went through that, I thought, wait a minute.
18      I saw these spools, and there were four
19  of them together.  And that's what went into my
20  quilt as the block.
21    Q  What page number?
22    A  Page 68.
23    Q  Would you look at page 67?
24          MR. COYLE:  Can I have the record
25      reflect we are talking about page 68 of

| Page 243 |
| --- |

1      Exhibit?
2          MS. THOMPSON:  Seventeen.
3          MR. COYLE:  Thank you.
4          THE WITNESS:  This must be the one I
5      saw.
6  BY MR. BUCKLEY:
7    Q  Which one is that, Ma'am?
8    A  One on the top of the page.  It's got
9  like four of them rotating around, and they look
10  like antique blocks.
11    Q  So, you looked at the color pictures.
12  You say that's the only thing you looked at in
13  this book?
14    A  Yes.
15    Q  On page 70 there is another color
16  picture; you looked at that too?
17    A  No.  I didn't have it -- wait a minute.
18  I didn't have it like this (indicating).  I had
19  it like this (indicating), going through,
20  glancing.  I saw the one with the spools there,
21  and I said that's great.  That's the circular
22  one, because I needed to have a 12-inch block.
23    Q  What inch block is that?  Page 42
24  says -- look at page 42 and it will tell you the
25  size of the block.

| Page 244 |
| --- |

1    A  I didn't know the size of the block.  I
2  didn't look at anything.  I just wanted the idea
3  of that, because I had to go home and write up
4  what came --
5    Q  Ma'am, let's at page 42.
6    A  Oh, I thought --
7    Q  Is that what it says on page -- it does
8  say that on page 67?
9    A  Yes.
10    Q  Look at  "instructions" on page 42,
11  correct?
12    A  Yes.
13    Q  And if you turn to page 42,
14  describing Scrappy Quilt, what size is Scrappy
15  Quilt?
16    A  Oh.
17    Q  I am sorry.  Scrappy spools?
18    A  Scrappy spools is 12 and a half inches
19  finished.  That would have been made it a 13
20  inch.
21    Q  You said you wanted a 12-inch block?
22    A  Well, when I -- for my quilt, I had to
23  draft it to a 12-inch block.
24    Q  You said when you looked at this you
25  wanted it to be a 12-inch block?

| Page 245 |
| --- |

1    A  It didn't have to be a 12-inch block.  I
2  was going to go home and draft whatever I needed
3  to.  I write my own patterns.
4    Q  On page 42 what size is that block?
5    A  That's a 12 and a half.  That's too big,
6  but mine isn't -- wait a minute -- what page was
7  that on?  Because my block -- my block is
8  different.
9      My block, where I actually sewed the
10  four blocks together, we have -- I think there is
11  also an added border on the outside.  Not that.
12      I have got the block with me.  I could
13  show you.
14    Q  I am just asking -- you say you looked
15  at that block?
16    A  I looked at this design.  I looked at
17  four, antique-looking spools together, and that's
18  what I saw.
19    Q  Okay.  When you -- on this particular
20  paper, which is Exhibit 7, on Exhibit 7, what
21  basic pattern are you showing?
22    A  I am showing what I developed.  By
23  rejecting the antique-looking spool, I developed
24  that one on my own.
25    Q  When you say "that one," is that the one

Brandon Smith Reporting Service, LLC

Pelletier v. Chitra Publications

6/21/2006                                                        Jo Ann Pelletie

| Page 402 | Page 404 |
|---|---|

**Page 402**

1    MR. COYLE: Not the first time for
2  her, but the first time for purposes of
3  production to determine whether or
4  not --
5    MS. THOMPSON: I don't think it's
6  the first time for purposes of
7  production.
8    MR. COYLE: Well, I guess if there
9  is a -- if you are doing this to try and
10  establish for us whether you have or
11  haven't produced them, I guess my
12  thought is I am happy to have you guys
13  go back to your office, you know, over
14  the next, you know, couple days,
15  whatever, and figure that out as opposed
16  to doing that now.
17    On the other hand, if there is a
18  particular document in there you intend
19  to ask the witness questions about --
20    THE WITNESS: This folder -- you
21  have other papers in here, but that are
22  not belonging in this folder.
23    MS. THOMPSON: That is fine. We
24  have given this --
25    THE WITNESS: This folder is where I

**Page 403**

1  wrote out my pattern in Microsoft Word,
2  and then I drew my pictures and pasted
3  them on so they could see I pasted them
4  on, and went to a copy machine.
5    That's all. Because this folder is
6  the parts that would go --
7    MS. THOMPSON: Right.
8  BY MS. THOMPSON:
9    Q  Is there anything in here that we need
10  to explain further?
11    A  That's all that.
12    Q  Okay. How about the documents you are
13  holding in your right hand?
14    A  Had that in here (indicating).
15    Q  I am asking is there anything we haven't
16  submitted that you need to submit?
17    A  No. This is -- that's the paper when I
18  taught workshops that they had, and I -- I had
19  submitted --
20    MS. THOMPSON: Anybody want to see
21  this? Okay. Paper sent --
22    THE WITNESS: I thought that had
23  been submitted.
24    MR. BUCKLEY: What do you have
25  there?

**Page 404**

1    MS. THOMPSON: This (indicating).
2    THE WITNESS: That's that paper
3  that -- because this (indicating) is the
4  file that held what was going to
5  Washington.
6  BY MS. THOMPSON:
7    Q  Sew Many Spools cover back -- anything
8  there that has any relevance?
9    A  That was just to hold the papers that
10  had the cut and paste things on them.
11    Q  Okay. This is -- I think we --
12    MR. COYLE: Can I just -- I am just
13  going to request, not right now, not at
14  the moment, but subsequent to today --
15    MS. THOMPSON: Copy of all this?
16    MR. COYLE: Anything in the purple
17  file that we are looking at.
18    MS. THOMPSON: We will put it all
19  together with everything that has to be
20  filed.
21    MR. COYLE: Could I get that on the
22  record, whatever was in the purple file,
23  23 -- if I can just have the floor for
24  two seconds. So the record is clear, I
25  know I think Claire is clear on this, I

**Page 405**

1  want the record to be clear.
2    I am requesting a copy of whatever
3  is in that purple file titled, I think,
4  "Sew Many Spools parts."
5    MS. THOMPSON: Parts.
6    MR. COYLE: If there is something in
7  this that's already Bates labeled and
8  produced, obviously I don't need it
9  again. Anything other than that I will
10  take a copy of it.
11    MS. THOMPSON: You will get it. I
12  will give you more than one copy, if you
13  like.
14    MR. COYLE: One will be fine.
15    MS. THOMPSON: At this point --
16  okay. I don't have any further
17  questions for Jo Ann.
18    MR. COYLE: Okay. I just have one,
19  possibly one quick followup.
20
21    REDIRECT EXAMINATION
22
23  BY MR. COYLE:
24    Q  I just -- for clarification purposes,
25  Ms. Pelletier, I am going to show you what we

102 (Pages 402 to 405)

Pelletier v. Chitra Publications

6/21/2006                                                    Jo Ann Pelletie

Page 406

1  have marked as Exhibit 19. This is what we
2  identified earlier as a photograph of
3  Ms. Talbot's quilt. Do you remember that?
4      A  Yes.
5      Q  Okay. That's the only item made by
6  Ms. Talbot that you are accusing of copyright
7  infringement. Correct?
8      A  Only one I know of that she has made.
9      Q  Okay. And the first time you saw, at
10 least the top of that quilt, was in your Log
11 Cabin class at your house sometime in or around
12 1998 or 1990 after Ms. Talbot returned from some
13 brief hiatus from your course?
14     A  It wouldn't have been '99, I don't
15 think. Yes, but I saw it. I don't know when she
16 showed it.
17     Q  Okay. In any event, it was prior to
18 that March 2000 Pioneer Valley Quilt Show?
19     A  Yes.
20         MR. COYLE: I have no further
21     questions.
22
23
24
25

Page 407

1              RECROSS EXAMINATION
2
3  BY MR. BUCKLEY:
4      Q  Ms. Pelletier --
5          MR. COYLE: Just so the record is
6      clear, I have no further questions at
7      this time, subject to what I pointed out
8      earlier about suspending based on
9      additional documentation that may be
10     produced.
11         MR. BUCKLEY: Ditto.
12 BY MR. BUCKLEY:
13     Q  Ms. Pelletier, when you were asked by
14 your counsel about calling in and someone saying
15 that your quilt was unique, I believe you said it
16 was Deb Feece, subsequent to that time you
17 decided to put the word "unique" into -- "I put
18 it in my pattern. I wrote "unique" because she
19 said unique." And you were referring to Deb
20 Feece?
21     A  Correct.
22     Q  When you said your pattern, it's what
23 you placed on the back material, I will call it
24 the supply list?
25     A  Yes.

Page 408

1      Q  Supply list part of the pattern you
2  submitted to the copyright office?
3      A  Of the commercial pattern that you would
4  refer to.
5      Q  It is in the last line of that pattern,
6  and you say "very unique" and you have it and --
7      A  Yes.
8      Q  -- and that's what you are referring to?
9      A  Yes.
10     Q  Question two: Ms. Pelletier, when your
11 counsel was talking to you about the various
12 elements of your quilt and your original design,
13 she pointed to a finished product, your quilt,
14 Exhibit number 12, and she asked you about the
15 various elements of it.
16        For clarification, to your belief does
17 it or does it not matter what colors or types of
18 fabrics are used in a quilt which will
19 distinguish that quilt from another quilt based
20 on the design?
21     A  Well, I feel that if they used a black
22 background and lighter color spools, it still --
23 I still have designed that design.
24     Q  Correct. If they used yellow fabrics,
25 and did it the same layout you did, would you

Page 409

1  think they copied your design?
2      A  It was the design and the instructions
3  that I was copyrighted on.
4      Q  If they put four blocks together
5  separated by the elements you have in there
6  rather than 97 blocks, that wouldn't matter
7  either, correct, as long as it had the sashing
8  with the corner blocks and the --
9      A  No. That still wouldn't give the same
10 appearance as having a bigger number. Four
11 together would be just four little blocks
12 together. No. No.
13     Q  Your design is the 96 blocks together?
14     A  No. They could do -- if they wanted to
15 make a small wall hanging like that, you know,
16 with four across and five down or something, that
17 would be more -- that would become more apparent
18 that it looked like this (indicating).
19     Q  Is there -- So the minimum -- do you
20 have a minimum or maximum that someone would have
21 to do that you would say was a copy of your
22 design or wasn't a copy of your design?
23     A  They are small logs. The very small
24 log, little three and three-quarter inch finished
25 block that I have in there. That makes -- if

---

## Page 414

```
 1            JURAT
 2      I, JO ANN PELLETIER do hereby certify
 3   that the foregoing testimony given by me on
 4   June 21, 2006 is true and accurate, including
 5   any corrections noted on the corrections page,
 6   to the best of my knowledge and belief.
 7
 8
 9
10      _____
        JO ANN PELLETIER
11
12      At _____in said County of
13   _____, this _____day of
14   _____, 2006, personally appeared JO ANN
15   PELLETIER, and she made oath to the truth of the
16   foregoing corrections by her subscribed.
17
18
19   Before me, _____ Notary Public.
20   My Commission expires: _____
21
22
23
24
25
```

## Page 416

```
 1           STATE OF CONNECTICUT
 2      I, JENNY C. EBNER, a Registered
     Professional Reporter/Commissioner within and for
 3   the State of Connecticut, do hereby certify that
     pursuant to Notice I took the deposition of JO
 4   ANN PELLETIER, on June 21, 2006, at the offices
     of CANTOR COLBURN, 55 Griffin Street, Bloomfield,
 5   Connecticut.
 6      I further certify that the above named
     deponent was by me first duly sworn to testify to
 7   the truth and nothing but the truth concerning
     her knowledge in the matter of the case of JO ANN
 8   PELLETIER VS CHITRA PUBLICATIONS and SANDRA T.
     TALBOT, now pending in the United States District
 9   Court District of Massachusetts.
10      I further certify that the within
     testimony was taken by me stenographically and
11   reduced to typewritten form under my direction by
     means of COMPUTER ASSISTED TRANSCRIPTION; and I
12   further certify that said deposition is a true
     record of the testimony given by said witness.
13
        I further certify that I am neither
14   counsel for, related to, nor employed by any of
     the parties to the action in which this
15   deposition was taken; and further, that I am not
     a relative or employee of any attorney or counsel
16   employed by the parties hereto, nor financially
     or otherwise interested in the outcome of the
17   action.
18      WITNESS my hand and seal this 5th of
19   July, 2006.
20
21
        _____
22      Jenny C. Ebner, R.P.R., L.S.R.
        Commissioner
23
24
   My Commission expires: August 31, 2010
25   License Registration Number: 00030
```

## Page 415

```
 1      TRANSCRIPT CORRECTIONS
        REPORTER: JENNY EBNER
 2
 3   CASE STYLE: JO ANN PELLETIER
 4            VS
 5   CHITRA PUBLICATIONS and SANDRA T. TALBOT
 6
     PAGE LINE        CORRECTION
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
        _____
23      JO ANN PELLETIER
        DATE:_____
24
25
```

## Page 417

```
 1   Jenny C. Ebner
     Brandon Smith Reporting Services
 2   44 Capitol Avenue
     Hartford, Connecticut 06106
 3   (860) 549-1850
 4
 5
     Date July 5, 2006
 6
     To CLAIRE THOMPSON
 7
     Dear Ms. Thompson:
 8
     Enclosed please find your copy of the deposition
 9   of JO ANN PELLETIER taken on June 21, 2006.
10   The original jurat and errata sheets are also
     enclosed.  Please note that the witness is
11   allowed 30 days to read and sign the deposition
     as the rules provide.
12
     Please return only the original notarized jurat
13   and errata sheets to Brandon Smith Reporting
     Services, 44 Capitol Avenue, Hartford,
14   Connecticut 06106 for filing, along with a copy
     to all counsel present.  Thank you for your
15   prompt attention to this matter.
16   If you have any questions, please call me.
17   Sincerely yours,
18
19   Jenny C. Ebner, R.P.R./L.S.R.
20
21
22
23
24
25
```

# Exhibit D



*Q Sara Frederic write for commission also*
*F-ovesion also*

2 Public Avenue · Montrose, PA 18801
Phone: (570) 278-1984 · Fax: (570) 278-2223
chitra@epix.net · WWW.QuiltTownUSA.com
*Traditional Quiltworks · Quilting Today · Miniature Quilts*

## Quilt Questionnaire

*Please complete the following questionnaire to the best of your knowledge so Chitra Publications may show and/or publish a pattern for your quilt.*

Name **SANDRA TOUCHETTE TALBOT**
Street Address or Box No. **15 PRYNNWOOD ROAD**
City **LONGMEADOW**                State **MASS**   Zip Code **01106**
Phone/Fax No. **413-567-5102**          E-mail
1. Title of quilt: "**JUST SPOOLING AROUND**"

*About your Design:*
Patterns for original designs or interpretations of traditional designs may be published. A member of our staff usually writes pattern directions. Interpretations of published designs require permission from the publisher.

2. My quilt is (please check only one):
a) ☐ my original design
b) ☑ my interpretation of a traditional design called **COURTHOUSE STEP LOG CABIN**
c) ☐ made using a pattern*
d) ☐ my interpretation of someone else's design*

* If you selected either **c** or **d** above, please provide the following information concerning your design source:
Pattern appeared in: ☐ magazine ☐ pattern packet ☐ book
a) Name of Quilt Designer / Quiltmaker
b) Publisher/Year
c) Address, if known

*About your Quilt:*
3. Width x Length: **APPROX 54" x 54"**          Finished Block Size: **4"**

4. *About your quilting design* - The quilting design on my quilt is: **IN THE DITCH**
☐ my original design ☐ made using a commercial pattern/stencil  ☐ my interpretation of someone else's design

5. Description of Quilt (colors, techniques, age, etc.): **MY QUILT IS BASICALLY A COURTHOUSE STEP LOG CABIN BLOCK WITH 1/4" FINISHED "LOGS". I LOVED MAKING THE "SPOOL" BLOCKS, AND WHAT BEGAN AS A WALLHANGING QUICKLY BECAME A QUILT OF 100 SPOOLS. I CHOSE STRIPES AND PLAIDS FOR THE CENTERS OR "THREAD" PORTION OF THE BLOCK, IT WAS BEAUTIFULLY MACHINE QUILTED BY JANIS AUSTIN GILBERT.**

6. Has this quilt been submitted or shown in any other publications? ☐ yes ☑ no
If yes, please list the name(s) and date(s) of the publication(s):

EXHIBIT

**CHI 010**

Please tell us anything you'd like to share concerning yourself. (How long you've been quilting, What your specialties are, etc.): *I HAVE BEEN QUILTING ABOUT 15 YEARS, BUT SEWING MOST OF MY LIFE MAKING CLOTHING, ETC. THIS QUILT WAS MADE SEVERAL YEARS AGO — I NOW WORK WITH MUCH BRIGHTER COLORS. I MAKE ONLY "SCRAP QUILTS" CHOOSING FABRICS FOR MY QUILTS IS MY FAVORITE PART OF THE QUILTING PROCESS.*

Please tell us any anecdotes you'd like to share relating to the quilt. (Why it was made, special fabrics, etc.):

_____
_____
_____
_____
_____
_____

**SUBMISSION OF YOUR QUILT AND/OR WRITTEN ARTICLE TO *QUILTING TODAY, TRADITIONAL QUILTWORKS, OR MINIATURE QUILTS* IS YOUR GUARANTEE THAT IT IS IN NO WAY AN INFRINGEMENT ON THE RIGHTS OF OTHERS AND THAT THE MATERIAL MAY BE PUBLISHED WITHOUT ADDITIONAL APPROVAL.**

Upon acceptance for publication in a specific issue, I agree not to submit the above referenced quilt and/or written article for publication elsewhere until Chitra Publications has published it.

*[signature]*     *September 18, 2002*
Signature     Date

I grant Chitra Publications the right to publish a pattern for the above referenced quilt.

*[signature]*     *September 18, 2002*
Signature     Date

I grant Chitra Publications the right to publish a pattern for my original quilting design.

*[signature]*     *September 18, 2002*
Signature     Date

Chitra Publications may show my quilt/pattern/quilting design on its website: www.QuiltTownUSA.com

*[signature]*     *September 18, 2002*
Signature     Date

*About Your Photos (if applicable):*

I have submitted a photo or photos of the above referenced quilt and grant Chitra Publications permission to publish said photo(s) at its discretion.

_____     _____
Signature     Date

Please list the name of the photographer if the photographer requires a credit to be published in the magazine.

_____

*About Our Photos (if applicable):*

I grant permission to photograph the above referenced quilt for publication at the discretion of Chitra Publications. Chitra Publications owns all rights to any photographs it takes.

*[signature]*     *September 18, 2002*
Signature     Date

*You will receive a complimentary copy of the magazine or book in which your quilt, photo(s) and/or written article appears.*

# Exhibit E

THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WESTERN DIVISION

JOANN PELLETIER,
                    Plaintiff

vs.

SANDRA T. TALBOT, CHITRA
PUBLICATIONS, CHARIOT PUBLISHING,
INC. As General Partner of Chitra
Publications, CHRISTIANE MEUNIER, As
Officer of Chariot Publishing, Inc.,
CHRISTIANE MEUNIER, As Owner of
Chitra Publications, and CHRISTIANE
MEUNIER d/b/a MOON OVER MOUNTAIN,
                    Defendants

Civil Action No. 05-30109-MAP

## PLAINTIFF PELLETIER'S ANSWERS TO FIRST SET OF INTERROGATORIES OF DEFENDANT, SANDRA T. TALBOT

1.      Specify with particularity each element of Plaintiff's "Sew Many Spools" fabric design and/or instructions for making that design that Plaintiff contends is original to the Plaintiff.

**ANSWER:**      **The design, setting, placement of the "log cabin" spool block, 1" finished sashing, 1" finished cornerstones and the borders of the "Sew Many Spools" fabric design are original to me. It is the unique arrangement of the separate elements that makes this quilt different from other uses of the "log cabin" block and quilt designs. The "log cabin" block that is sewn into the "Sew Many Spools" quilt is also unique. The center of the block is large (compared to the size of the logs around it) and represents "thread". Plaids, checks, and stripe fabrics were used to represent the thread with the stripes placed horizontally to look like the thread wrapped around the spool.   I used a 2 ¾" square as my center "thread" (finished 2 ¼" square when sew).**

**The 3 (1/4" wide finished) narrow logs placed above and below the "thread" are representing the SPOOL that the thread is rolled onto. The fabrics used are darker browns and blacks.  They are of various**

prints. The narrow logs to the right and left of the center are a light fabric used as a background so the "spool" would stand out and be easily seen.

It is unusual to use sashing and cornerstones with a log cabin block. I used it to separate the spools from one another. They stand out better than if they were all right next to each other with nothing separating them. The cornerstones added interest and kept the spools connected.

Originally I planned on only one wide border, but when it came time to sew the border on, I decided to add an additional 1" border before the final wider border. Also, in the original design, I didn't have an additional row of sashing and cornerstones before the 1" border. I digressed from my original design by adding an additional row of sashing and cornerstones, and a 1" inner border before sewing on the last wider border.

Sew Many Spools" is machine-quilted by me. It is quilted "in the ditch" between the spool and sashing/cornerstones. There is no quilting in the log cabin "spool" block. This allows the "spool" to stand out. It is also quilted "in the ditch" before and after the first 1" border. The last 2 ½" border is quilted using loops and meandering.

2.  Specify with particularity each element of Plaintiff's Sew Many Spools fabric design and/or the instructions for making that design that Plaintiff contends is entitled to copyright protection.

ANSWER:  The entire "Sew Many Spools" fabric design is entitled to copyright protection, as are the instructions. I worked the colors/values of the log cabin block so it looked like a modern, rather than antique, spool of thread typically seen in log cabin blocks. My spools have a chunky center thread area with 3 small narrow logs sewn together to look like spools that the thread is rolled onto. The typical spool-like log cabin antique blocks are very tall and narrow looking. That was not the look that I wanted. I tried various ideas and did trial and error sketches and sewing to arrive at the log cabin spool-look block that is used in the "Sew Many Spools" quilt design. I worked many hours to arrive at the size of the center "thread" and the small size of the logs. I wrote the very detailed instructions.

It is my use of a chunky "thread suggesting" fabric in the center of the log cabin block, along with 3 small dark logs above and below (to look like the spool that the thread is rolled around) and the light background fabric on each side, that makes my interpretation of the log cabin block unique. The sizes of each element of my spool log cabin block and the manner in which they work together (the types/values of fabrics used to represent thread, spool and

background) with the unusual setting/placement of the sashing and cornerstones (being used with a log cabin block), plus borders, entitle the design and instructions to copyright protection.

3.    Specify with particularity each element of Plaintiff's Sew Many Spools fabric design and/or the instructions for making that design that Plaintiff contends has been copied by Defendant Talbot.

ANSWER:    **Talbot made the "Just Spooling Around" design in virtually the same way that I instructed her class relative to the "Sew Many Spools" design in 1993 and 1994, with very slight differences. While Talbot contends that her spools are rectangular, rather than square, that is a minor issue. She merely converted the center to a rectangle, rather than a square, because she was in a "quilt challenge" where only rectangles could be used when making the block.**

**Everything else remained the same as she was instructed in class. She also had to make a ¼" (or so) adjustment on the length of the spool and background logs, depending on how much taller she made the "thread" center. There is no visual difference to the eye.**

**FABRIC USED - Talbot made her quilt with the exact same size (1" wide, finished) sashing and cornerstones and used the same types/values of fabrics as my "Sew Many Spools" design. The center thread is made of plaids, checks, and stripes – with stripes placed horizontally to look like thread wound around the spool – exactly above and below the center "thread") –like mine. Talbot's background fabric is light colored like mine. There are multiples of shades of white and beige fabrics that could be selected. It is a light color/value allowing the log cabin spool to stand out. Talbot used the same fabric as mine for the cornerstones. Talbot used light background fabric for her sashing just like mine. Basically, Talbot's is identical to mine in size and placement of the sashing and cornerstones. Some fabrics are identical in both quilts.**

**FINISHING – Talbot has nothing separating her outside spools from her border. Talbot finished her quilt as originally demonstrated in my class. Talbot's quilt is also square – 10 log cabin spool blocks across and 10 log cabin spool blocks down.**

**QULTING – Talbot called me <u>before</u> the 2000 quilt show, concerned about how her quilt was looking without any quilting. She said that when she sewed on the buttons, (presumably to the "cornerstones") the quilt sagged when hung vertically, as it would be in the quilt show. She wasn't happy with how it was looking. I told her that it needed to be quilted to keep everything in place when it was hung vertically. She wasn't comfortable with machine quilting and even asked me to**

306259.2                                    3

quilt it for her. I said "no", but I did tell her exactly how to do the quilting – "stitch in the ditch" between the spool and sashing/cornerstones.

**CONCLUSION – Talbot's "Just Spooling Around" quilt and my "Sew Many Spools" quilt look the same to the human eye. The only differences would be the number of blocks across and down and the added row of sashing/cornerstones and 1" border before the last border on my quilt. The shape (rectangular vs. square) of the log cabin spool block within the quilt would be undetectable to the eye unless measured. In fact, Chitra Publications (the magazine and book) wrote its instructions making a square block which was the original shape of my "Sew Many Spools" spool block.**

4.     Identify all prior works upon which Plaintiff's Sew Many Spools fabric design and/or the instructions for making that design is based.

**ANSWER:     There are no exact prior works on which my quilt was based; it is my original work. I took the traditional courthouse step/log cabin block and chose the sizes of the center and logs, along with the way the fabrics are used (color/values) to make a log cabin block that looked like a regular chunky spool of thread. I wanted something different for the look of the quilt, and chose sashing and cornerstones, as I have on other quilts I've made. I made quilts, wall hangings, tote bags, etc using a "spool-like" design from 1987 – 1993, but none of these blocks was made with a log cabin construction.**

5.     Identify all persons who participated in the creation of Plaintiff's Sew Many Spools fabric design and/or the instructions for making that design, and for each person identified in response to Interrogatory no. 5, described the nature of such participation, including but not limited to the elements contributed and physical contribution made.

**ANSWER:     I am the only individual who participated in the creation of the log cabin spool block, the finished design for the "Sew Many Spools" quilt. See answer to interrogatories no. 1, 2 and no. 4 for more detailed description of the elements and the manner in which I created the design.**

6.     Describe the circumstances of Plaintiff's first publication of her Sew Many Spools fabric design and the first publication of the instructions for making that design, including but not limited to the date(s) of such publication, the medium(s) used to so publish, and the persons involved in such publication.

**ANSWER:     January 21, 1993 was the first time the "Sew Many Spools" quilt design/instructions was revealed during the "bonus" part of a log cabin club class that Talbot attended. Talbot and other members of**

the class received a lesson each month (total of 12) for the block instructions to make into a sampler quilt. They often had a "bonus" of additional things they could do with the block/or parts of the block that was the lesson for that month. For their "bonus", I showed the class the "spool" log cabin block used in a different way than our regular monthly lesson. I showed and told them about the quilt I was making using the small 3 ¾" spool log cabin block that I had created through trial and error using very narrow ¼" logs. This was nothing any of us had ever done before.

While preparing for the class, I challenged myself and made several different sizes of the "spool" log cabin block. I especially liked the small 3 ¾ "spool" that I had experimented with and made several of them. I decided that they were so different that I was going to make a quilt with them. I also gave the class the instructions (measurements) for the log cabin "spool" block and demonstrated to them with the blocks, sashing, cornerstones how it would go together to make the design of "Sew Many Spools". I laid out the cornerstones and sashing as I had drawn them with fabric pieces.

To the best of my knowledge, the January 21, 1993 class was attended by Kay Meehan, Toni ?, Penny ? (Toni and Penny are sisters – not sure of their last names), Connie Roy, Helen Bajek, Cathy Ayotte, and Sandra Talbot.

7.    Identify all persons to whom Plaintiff has granted permission to exercise any of the rights available under 17 U.S.C. §106 regarding Plaintiff's Sew Many Spools fabric design, and/or the instructions for making that design.

**ANSWER**    **The students enrolled in my spool class/workshop had my permission to make a quilt/wallhanging <u>for their personal use only</u>. Neither Ms. Talbot nor any other individual was permitted to exercise any rights under my copyright of the "Sew many Spools" design and instructions.**

8.    From the time period of the creation of Plaintiff's Sew Many Spools fabric design and/or the instructions for making that design through and including April 30, 2005, identify all persons known to the Plaintiff that sold any products or materials that contained or utilized Plaintiff's Sew Many Spools fabric design and/or the instructions for making that design, or published any products or materials that contained or utilized Plaintiff's Sew Many Spools fabric design and/or the instructions for making that design, and for each such sale and/or publication, identify the date and specify with particularity the circumstances surrounding such sale and/or publication.

**ANSWER**    **Talbot sent my quilt design and instructions to CHITRA PUBLICATIONS ("Chitra") and Christiane Meunier ("Meunier") some time after SEPT 2000. Chitra and Meunier subsequently**

published them in various books, magazines and websites, including: *www.QuiltTownUSA.com.*

CHITRA first published my design/instructions with the credit for the quilt design/instructions going to Sandra Talbot in its magazine QUILTWORKS TODAY October/November 2003 - pages 26-27-28. On page 58, CHITRA also published added instructions for "paper foundation piecing" my "spool log cabin interpretation". This now makes it possible for more quilters to be able to make my quilt design (paper piecing is another technique for making difficult quilt blocks). This magazine is sold all over the world. It was also offered for sale on "Chitra's website.

In the August/September 2004 QUILTWORKS TODAY magazine, CHITRA had a *"SPECIAL ANNOUNCEMENT"*. On page 18, Chitra advertised a new book that they published – "A FEW OF MY FAVORITE SCRAP QUILTS". The "spool" quilt is featured on the cover and on page 3 of the book. The quilt design/instructions are on pages 10-11-15, including the "paper foundation piecing" technique. In the October/November 2004 issue of QUILTWORKS TODAY magazine, page 19, an advertisement states that the book is *"on sale now!"*. It shows the cover of "A FEW OF MY FAVORITE SCRAP QUILTS" featuring the spool quilt on the cover - $14.95. The ad states that the book is: *"available at fine quilt shops and fabric stores everywhere. Shop on-line at:* www.QuiltTownUSA.com *or call (800)628-8244"*.

A Few Of My Favorite Scrap Quilts has pictures and instructions for making 10 of Christiane Meunier's favorite quilts that have been published in her magazines previously. The book is also available through quilt mail order catalogs.

CONNECTING THREADS catalog, Oct 2004 issue, page 38. "A Few of My Favorite Scrap Quilts" book is pictured with the Spool quilt on the cover. There is also a larger full color picture of the quilt in its catalog. It is a flat view of the whole quilt (not draped as on the bookcover). Connecting Threads also advertised the book on its website calling it "one of their best selling quilt books". They advertised the book for months. They are located at – PO Box 870760, Vancouver WA 98687-7760, a major quilt supply mail order company.

Keepsake Quilting located at Route 25B, PO Box 1618, Center Harbor NH 032226-1618 advertised the quilt in its "almost spring" and summer update 2005 issues.

Thimbleworks Quilt Shop located at 56 Shaker Road, East Longmeadow MA sold the book in September 2004.

Quilters Dream located in Willimantic CT sold the book in May 2005.

I have seen the book at quilt shows. I saw the book at several vendors' booths in Lancaster PA in April 2005 and at the Quilters Heritage Quilt Show, November 2004.

I have seen it on internet websites all over the world including:

http://www.quiltadventures.com/bkfavoritescrapquilts.html

http://www.quiltworksonline.com/cgi-bin/Store/store.cgi?cart_id=&product=Chitra_Publications

http://www.amazon.com/exec/obidos/search-handle-url/104-6584107-9819901?%5Fencoding=UTF8&dym=0&search-type=ss&index=stripbooks%3Arelevance-above&field-keywords=a%20few%20of%20my%20favorite%20scrap%20quilts%20meunier as recently as April 10, 2006.

There are so many that it is impossible to list all the websites around the world which advertise the book for sale.

9.    Identify all activities undertaken by Plaintiff to assert or enforce any alleged copyrights in her Sew Many Spools fabric design and/or the instructions for making that design, and/or any derivative work thereof.

**ANSWER**    I told students in my classes that they were only permitted to use the instructions to make the design for their personal use. I read copyright articles aloud in class, and we discussed the fact that only the person who had the copyright had the right to make any derivative of the original design.

In April - May 2000, I gave each student in my log cabin club classes a paper saying that what they made from the class instructions *"was meant for their own personal use and enjoyment – NOT for public display or publication"*. This also applied to the "bonus" design/instructions for the "Sew Many Spools" design. I personally read copyright information to the class and discussed it with all the log cabin class students, including Talbot. Also in 2000, Talbot threatened to submit the Copyright Pattern and Design to Chitra. I told her that it was not her design to give away. I also said "don't give my design away". Also, I told her that she had made a quilt "just like my drawings and instructions" that I had taught her. In September 2000, she told me that she hadn't yet sent it to Chitra. I told her not to come back to class.

MAY 3 2000 - 2:33 p.m. I called Chitra (570-278-1984) and told the representative that the "spool" pattern/design that Chitra published was my work, not Talbot's.

> **On September 21, 2004, Attorney Deborah Basile of Doherty, Wallace, Pillsbury and Murphy, P.C. sent a cease and desist letter to Talbot, Meunier and Chitra on my behalf.**

10.     Specify with particularity when and how the Plaintiff first became aware of Defendant Talbot's submission of "JUST SPOOLING AROUND" to Defendant Chitra.

**ANSWER**     **I became aware that Talbot had sent my quilt design/instructions to Chitra when the QUILTWORKS TODAY Oct/Nov 2003 issue was published in October 2003. Chitra printed the design/instructions on pages 26-28.**

**I found out about the book "A Few of My Favorite Scrap Quilts" by Christiane Meunier and Chitra when a friend asked me if I'd read the e-mail from Thimbleworks Quilt Shop on September 1, 2004. She told me what it said about the quilt. I wasn't able to look at the e-mail for many days. I was very upset that Talbot had given the design to Chitra.**

**The e-mail said, . . . "A Few of My Favorite Scrap Quilts" from Chitra – with a quilt by customer Sandy Talbot and quilted by our Jan Gilbert.**

11.     Describe with particularity any direct evidence of copying upon which Plaintiff intends to rely to prove infringement.

**ANSWER**     **As discussed in prior interrogatory answers, Talbot obtained instructions for the copyrighted design while attending my log cabin club spool classes/workshop and made a virtually identical design as I had instructed her class relative to the "Sew Many Spools" design in 1993 and 1994. The elements of my spool log cabin block and the manner in which they work together, i.e., type/values of fabrics used to represent thread, spool and background, with the unusual setting/placement of the sashing and cornerstones, plus borders and color/values of the log cabin block designed to look like a modern spool of thread are all direct evidence of Talbot's infringement of my copyright. I reserve my right to further supplement this response prior to trial.**

12.     Identify any charted, modifications, or revisions to Plaintiff's Sew Many Spools fabric design from the date of its creation to the present, including the date each such change, modification or revision was made.

**ANSWER**     **As discussed in prior interrogatory answers, I tried various ideas and made trial and error sketches and sewing to arrive at the log cabin spool look that I used in the copyrighted design and instructions. I tried both the ¼" finished logs and the ½" finished logs in the design.**

> Originally I planned on only one wide border but when it came time to sew the border, I decided to add an additional 1" border before the final wider border. I also added a row of sashing and cornerstones and a 1" inner border before sewing on the last wider border.

13.  Set forth with particularity Plaintiff's damages calculation, including a detailed description of the theory upon which the claim for damages is based.

**ANSWER**   **I seek statutory damages for the defendants' unauthorized reproduction, publication and distribution of my quilt design and instructions. I no longer teach quilting classes as a result of the distress that I have experienced due to the conduct of the defendants. I have also incurred substantial attorney's fees and costs in prosecuting the defendants' copyright violations.**

**I seek to recover all profits realized by the defendants from their unauthorized use of my copyrighted design. Such profits will be based on the volume of sales from the publication and distribution of my quilt design in various stores and on various websites operated by the defendants and any successor company, entity or individual. In addition to statutory damages, I seek to recover actual damages equivalent to all income received and sales generated by the defendants as a result of this infringement and for all other rights and remedies available by all applicable state or federal law. I reserve my right to supplement this response prior to trial.**

14.  Identify with particularity any activities from January 21, 1993 to the present taken by Plaintiff to protect her Sew Many Spools fabric design, and/or the instructions for making that design.

**ANSWER**   **See answer to interrogatory no. 9 above.**

15.  State in detail all facts which support the allegations contained in paragraphs 13-15 of the Plaintiff's Complaint.

**ANSWER**   **Please clarify whether this interrogatory applies to the Plaintiff's original Complaint or Amended Complaint.**

16.  State in detail all facts which the Plaintiff contends support the allegations made in Count III of her Complaint.

**ANSWER:**   **Please clarify whether this interrogatory applies to the Plaintiff's original Complaint or Amended Complaint.**

17.  Set forth in detail all facts that the Plaintiff alleges support the allegations contained in Count V of her Complaint.

**ANSWER**    **Please clarify whether this interrogatory applies to the Plaintiff's original Complaint or Amended Complaint.**

18.    Identify all witnesses, other than expert witnesses, that the Plaintiff may call as a witness at the trial of this case, stating for each such person their full name, address, and the testimony expected to be given by such person.

**ANSWER:**    **The plaintiff has not yet determined which witnesses will be called at trial and reserves her right to supplement this response.**

19.    If you intend to call one or more expert witnesses at trial in this case, please state the following:

    a.    The name and address of each such expert;
    b.    The nature and substance of any such expert opinions ad expected testimony;
    c.    Any such expert witnesses' education background, employment history, and qualifications; and
    d.    Whether any such expert witness have generated a written report and, if so, the dates of such reports.

**ANSWER**    **No such expert witnesses have yet been retained or designated. I reserve my right to supplement this response prior to trial.**

20.    Identify by name and address each individual who was present in any quilting class taught by the Plaintiff in which her Sew Many Spools fabric design and/or the written instructions for making that design were displayed, presented, taught, provided or in any other way conveyed by the Plaintiff and/or during which the Plaintiff expressed, either verbally or in writing, a claim of copyright tin the Sew Many Spools fabric design and/or the written instructions for making that design.

**ANSWER**    **Upon information and belief, the names of students in the 4 log cabin classes that I taught at Thimbleworks Quilt Shop, East Longmeadow MA may be obtained from Pam McLaren, previous owner of Thimbleworks. There were approximately 8 – 15 students in each of the 4 log cabin classes.**

    **To my knowledge, the following individuals attended the "spool" class that I taught in Enfield, CT on July 12, 1994:**

    **Nell Parsons – 282 Taylor Rd – Enfield CT 06082**

    **Mary Lou Wade – moved to Florida**

    **Cynthia Mahdalik – 15 Laurel Dr – Stafford Springs CT**

    **Jeannine Racine – Enfield CT**

    **Chris Pacewicz – moved to Florida**

Janet Spencer – 9 Alaimo Drive – Enfield CT 06082

Audrey Hennis – Somers CT

Upon information and belief the following students were enrolled in the log cabin club attended by Talbot in May 2000:

Sandra Talbot -

Connie Roy - 173 Middle St - Springfield MA

Lynne Rehbein - 79 Lakeshore Drive - West Brookfield MA

Kay Meehan - 76 Arthur St - Springfield MA

Helen Bajek - 86 Oldefield Farms - Enfield CT

Kathy Ayotte - 9 Gover Road - Millbury MA

Sandy Carlson – 115 High Pine Circle – Wilbraham MA

~~Theresa Johnson - 66 Maplewood St - Longmeadow MA~~

Claire MacDonnell - 39 Pleasant View Ave - Longmeadow MA

I reserve my right to supplement this response prior to trial.

Names of Students in log cabin club – Enfield CT - 2000

Rosalie Keegan – 44 Glenwood St - Enfield CT

Dolores Lane - 20 Standish St - Enfield CT

Barbara Lange - 64 Oakwood St - Enfield CT

Norma Smith - 45 Bridge St Apt 212 - Suffield Ct

Nell Parsons - 282 Taylor Rd - Enfield CT

Betty Pearson - 110 South Road Apt 49 - Enfield CT

Janet Spencer - 9 Alaimo Dr - Enfield CT

Marge Lenentine - 72 Sunnyview Dr - Suffield CT

Cynthia Mahdalik - 15 Laurel Dr - Stafford Springs CT

Jean Hoagland - 477 Wolfswamp Rd - Longmeadow MA

I reserve my right to supplement this response prior to trial.

21.    Set forth in detail any and all facts upon which the Plaintiff relies to support any allegations that any of Defendant Talbot's conduct as complained of in the

Complaint and which the Plaintiff contends to have been wrongful was conducted knowingly or intentionally.

**ANSWER**     **Talbot attended quilting classes in which I read a copyright notice stating that any quilts expressly or derivatively reproduced from my teaching, including the copyrighted pattern, was for Talbot's own personal use and enjoyment and was not for public display or publication. On or about April to September 2000, Talbot threatened to submit the copyrighted pattern and the copyrighted design to Chitra, resulting in my asking her to leave the class.**

**On or about April or May 2000 I asked Talbot why she wanted to give Chitra a copy of my design. She said that she wanted her name and picture in their magazine. I told her to send in something else that she had actually made and suggested several other quilts to her. Talbot indicated that the "Sew Many Spools" quilt was the one that Chitra representatives had seen at a quilt show and wanted for their publication. It appeared to me that Talbot intentionally gave Chitra the design, claiming that it was hers, in order to have her "15 minutes of fame".**

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _3rd_ DAY OF MAY, 2006.

*JoAnn Pelletier*

JOANN PELLETIER

### CERTIFICATE OF SERVICE

I, Claire L. Thompson, do hereby certify that I have caused a copy of the foregoing to be served upon counsel of record by mailing same first class mail, postage pre-paid, to: Steven M. Coyle, Esq., Cantor Colburn, LLP, 55 Griffin Road South, Bloomfield, CT 06002 and Joseph D. Buckley, Esq., 1237 Holly Pike, Carlisle, PA 17013.

Dated: May 4, 2006

*Claire L. Thompson*

Claire L. Thompson

THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

WESTERN DIVISION                    CIVIL ACTION NO. 3:05-CV-30109-MAP

JOANN PELLETIER                              )
                                             )
                    Plaintiff,               )
                                             )
v.                                           )
                                             )
SANDRA T. TALBOT, CHITRA                     )
PUBLICATIONS, CHARIOT PUBLISHING, INC.       )
As General Partner of Chitra Publications,   )
CHRISTIANE MEUNIER, As Officer of Chariot    )
Publishing, Inc., CHRISTIANE MEUNIER, As     )
Owner of Chitra Publications, and CHRISTIANE )
MEUNIER d/b/a MOON OVER MOUNTAIN,            )
                    Defendants.              )

## DECLARATION OF SANDRA T. TALBOT IN SUPPORT OF OPPOSITION TO PLAINITIFF'S MOTION FOR REAL ESTATE ATTACHMENT

I, Sandra T. Talbot, on oath, hereby depose and state as follows:

1.      I am a defendant in the above-referenced matter.

2.      I currently reside at 15 Prynnwood Road, Longmeadow, Massachusetts. It is my understanding that the plaintiff, JoAnn Pelletier, is seeking a $250,000 attachment against this real estate which is owned by my husband, Kent Talbot, and I.

3.      My husband and I have lived at 15 Prynnwood Road, Longmeadow, Massachusetts for 30 years. We raised our children in this house, we now have grandchildren who live in the area and who we regularly take care of, and we have no present intention of moving from or otherwise conveying our home.

4.    I received no compensation, nor made any profits, based upon my making or display of my quilt which is at issue in this case. I received no monetary compensation from Chitra in exchange for their publication of pictures of my quilt in one or more of their magazines or other publications. I never sold my quilt, nor otherwise commercialized it any way.

Signed and sworn to under the pains and penalties of perjuries, this _16th_ day of November, 2006.

Date: _November 16, 2006_

_Sandra T. Talbot_
Sandra T. Talbot

Respectfully Submitted,

Sandra T. Talbot
Defendant

By _____
Steven M. Coyle, B.B.O. #564189
CANTOR COLBURN LLP
55 Griffin Road South
Bloomfield, CT 06002
(860) 286-2929

I hereby certify that a true copy of the above document was served upon the attorney of record for each party through the ECF system on the _20th_ day of November 2006.

_____
Steven M. Coyle, Esq.